**FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

OCT 18 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| KURT MICHAELS,<br><br>    Petitioner-Appellant,<br><br> v.<br><br>RON DAVIS, Acting Warden of San Quentin State Prison; ATTORNEY GENERAL FOR THE STATE OF CALIFORNIA,<br><br>    Respondents-Appellees. | No. 15-99005<br><br>D.C. No.<br>3:04-cv-00122-JAH-JLB<br><br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued and Submitted October 25, 2018
San Francisco, California

Before: Ronald M. Gould, Marsha S. Berzon, and Carlos T. Bea, Circuit Judges.

Per Curiam Opinion;
Partial Majority Opinion by Judge Bea
Dissent by Judge Berzon

# SUMMARY[*]

## Habeas Corpus/Death Penalty

In a per curiam opinion addressing all issues except penalty phase prejudice, and a separate majority opinion addressing penalty phase prejudice, the panel affirmed the district court's judgment denying Kurt Michaels's habeas corpus petition challenging his California conviction and death sentence for the 1988 murder of JoAnn Clemons.

## Per Curiam Opinion

Michaels argued that application of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), is unconstitutionally retroactive—*i.e.*, that the relevant event to which AEDPA's legal consequences attached is the automatic appeal of his capital sentence in state court, which occurred before AEDPA's effective date. Rejecting this argument, the panel wrote that AEDPA attached new legal consequences to petitions for federal habeas relief, not to Michaels's state court litigation—litigation that was resolved on state law grounds and substantive rules of constitutional law, both unaffected by AEDPA.

Michaels's Claim Three challenged, under *Miranda v. Arizona*, 384 U.S. 436 (1966), the admission of his confession at both the guilt and penalty phases of trial, on the ground that the confession was elicited after Michaels invoked his rights to counsel and silence. The panel wrote that the California Supreme Court's conclusion on direct appeal that Michaels did not unambiguously invoke either his right to counsel or his right to silence with respect to all questioning is fully supported by the record. The California Supreme Court did recognize that Michaels selectively invoked his right not to answer a specific question as protected by *Miranda*, but the California Supreme Court neither determined precisely what question Michaels had declared off limits nor whether the ensuing interrogation impermissibly violated Michaels's invocation of his right to silence with regard to the subject covered by that question. The panel held that the California Supreme Court's decision to ignore a defendant's unambiguous and unequivocal selective

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

invocation of his right to silence as to an area of inquiry during a custodial interrogation, requiring instead that the refusal be repeated in response to each question regarding the subject matter as to which the right was earlier invoked, was contrary to the law clearly established by *Miranda* and its progeny. The panel therefore reviewed de novo the aspects of Michaels's selective invocation of *Miranda* claim, and held that the detectives' continued questioning regarding Michaels's role in the murder after Michaels's selective invocation violated his *Miranda* rights, and that admission of the parts of the interrogation in which Michaels confessed to "what happened" was constitutional error. The panel held that the *Miranda* violation was harmless as to the guilt phase because the evidence presented at trial showing that Michaels committed capital murder was overwhelming even without the confession.

In Claim Four, Michaels argued that his trial lawyers provided ineffective assistance of counsel (IAC) by disclosing to the prosecution a confidential note Michaels had handed to his lawyers, during the preliminary hearing, stating that he would commit violence against his then-codefendant Popik if Popik was not reseated away from Michaels ("the Popik note"). The California Supreme Court held that introduction of the Popik note violated the attorney-client privilege but was harmless. The panel wrote that this IAC claim—which Michaels did not raise on initial state habeas review, as required by California law—was procedurally defaulted. The panel therefore addressed whether the procedural default is excused under *Martinez v. Ryan*, 566 U.S. 1 (2012), and held that it is. In so holding, the panel wrote: (1) the IAC claim is "substantial" under *Martinez* because (a) the claim clearly has some merit, and (b) Michaels demonstrated a substantial claim of prejudice resulting from his trial counsel's deficient performance; and (2) Michaels established "cause" under *Martinez* because (a) Michaels's initial post-conviction relief (PCR) attorneys' failure to raise the IAC claim was unconstitutionally deficient performance, and (b) there is a reasonable probability the PCR court would have granted Michaels relief had his PCR counsel raised the trial counsel IAC claim.

Because the procedural default of Claim Four is excused, the panel addressed the merits of Michaels's claim that his counsel was constitutionally deficient, as well as—on the merits (in the separate majority opinion)—the cumulative effect of counsel's constitutionally deficient performance and Michaels's improperly admitted confession on the sentencing phase of Michaels's trial. Applying AEDPA review, the panel held that there was no reasonable basis for the state court to have concluded that Michaels's trial counsel's performance was constitutionally adequate as to the disclosure of the Popik note. The panel wrote that under clearly established law and prevailing standards of representation at the time, counsel's breach of

attorney-client confidentiality amounted to constitutionally deficient performance, and it was objectively unreasonable for the California Supreme Court to conclude otherwise, assuming that it did.

In Claim Six, Michaels contended that the trial court violated Michaels's Sixth Amendment right to counsel by denying his motion to substitute another attorney for appointed attorney Richard Grossberg after an irreconcilable conflict with Michaels developed. The panel held that the California Supreme Court reasonably concluded that the conflict was the result of Michaels's subjective distrust, and that Michaels's actions triggered the breakdown of the relationship. The panel held that the state court's other conclusion—that Grossberg rendered constitutionally adequate assistance as it relates to the attorney-client conflict claim—was also reasonable.

In Claim Seven, Michaels argued that his other attorney, Mark Chambers, provided ineffective assistance when he advised Michaels to proceed pro se after the trial court refused to relieve Grossberg. As it turned out, during both the guilt and penalty phases, Chambers conducted the trial proceedings. Given that circumstance, the panel agreed with the district court that, whether or not Chambers provided constitutionally inadequate advice, Michaels did not show that he was prejudiced.

In Claim Nine, Michaels contended that the trial court erred in not conducting a *sua sponte* competency hearing, and his attorneys were constitutionally ineffective for failing to raise the competency issue. The panel held that neither the California Supreme Court's conclusion that the evidence before the trial court was insufficient to require a *sua sponte* competency hearing, nor its rejection of Michaels's IAC competency claim, was unreasonable under AEDPA.

In Claim Thirteen, Michaels argued that the trial court's denial of his request for a continuance before trial on March 26, 1990, violated his due process rights. Given that the standard for determining whether a continuance violates due process affords the substantial discretion to a trial court, as well as the deference owed under AEDPA, the panel held that the circumstances here do not render the California Supreme Court's decision that denial of the continuance was not a due process violation unreasonable.

**Majority Opinion**

Michaels argued that he is entitled to habeas relief because the introduction of his confession and the Popik note during the penalty phase of the trial prejudiced him

by causing the jury to render a death verdict they otherwise would not have in the absence of this unconstitutional evidence. Applying the actual prejudice standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the panel held that Michaels was not prejudiced by the admission of the confession. The panel explained that there is not a single aggravating factor that the jury could have gleaned from Michaels's confession evidence that was not otherwise proved by ample admissible evidence, nor any piece of mitigation evidence that was rebutted by the confession that would otherwise have gone unrebutted; indeed, the confession evidence helped support the defense's own theory that Michaels killed Clemons to protect her daughter, Christina. Given the limited use of the Popik note and its minimal evidentiary value at trial, the panel could not conclude that it had a prejudicial effect on the jury, even in combination with the confession evidence. The panel therefore rejected Michaels's claim of cumulative error as to the admission of his confession and the Popik note.

In Claim Five, Michaels contended that the prosecutor committed four species of misconduct during the penalty-phase closing arguments. Affirming the denial of relief on this claim, the panel held: (1) the prosecutor did not commit misconduct by arguing Michaels's interest in devil-worship to the jury based on his own tackle box writings and for the proper purpose of rebutting the mitigating evidence of his church membership; (2) there is no clearly established federal law that prohibits the rhetorical admission of the defendant's own views of the suitability of the death penalty during the sentencing phase of the trial; (3) isolated comments describing Michaels as a "contract killer" did not cross into the proscribed territory of arguing that Michaels had committed other murders, and do not constitute the sort of egregious misconduct that amount to a denial of constitutional due process; and (4) given the context of the entire trial and the deferential standard review required under AEDPA, the trial was not rendered fundamentally unfair by the prosecutor's use of name-calling and emotional appeals.

In Claim Ten, Michaels argued that he is entitled to effective assistance of advisory counsel. In Claim Eleven, Michaels argued that Chambers was ineffective at both the guilt and penalty phases because Chambers failed to call as a witness Christina's father, Wendell, who would have corroborated Christina's testimony about how her mother physically abused her. In Claim Twelve, Michaels argued that Chambers was ineffective at the penalty phase because Chambers failed adequately to investigate and present evidence (1) that Michaels's mother was bipolar; (2) that Michaels's mother physically and emotionally abused him throughout his childhood; and (3) that Michaels's methamphetamine use was affected by his long-term brain damage, difficult background, and mental illness. As

to Claim Eleven, the panel held that the fact that Chambers admitted that he did not consider calling Wendell as a witness does not render the omission per se deficient; and that given the limited probative value of Wendell's testimony, the California Supreme Court could have reasonably concluded that the failure to produce such testimony was not outside the wide range of professionally competent assistance. As to Claim Twelve, the panel held that the California Supreme Court could have reasonably found that Chambers was not deficient in failing to inquire further into Michaels's mother's mental health, that it would not be unreasonable to conclude that Chambers's decision not to investigate further into her abusive conduct was reasonable, and that counsel's decisions concerning drug use and brain damage were not unreasonable or deficient. Because Chambers did not render ineffective assistance, the panel did not need to decide the threshold question (in Claim Ten) whether Michaels had a right to effective assistance of nominally advisory counsel where, as here, counsel actually conducted the entire trial, including the penalty phase, and made all pertinent decisions.

Judge Berzon concurred in the per curiam opinion, but dissented from the majority opinion with respect to the holding that the admission of Michaels's confession and the Popik note did not cumulatively prejudice the penalty phase of the trial. She would hold the introduction of Michaels's complete improperly *Mirandized* confession and of the Popik note cumulatively prejudiced Michael at the penalty phase of his trial, and would therefore grant the petition as to the penalty phase. She harbors grave doubt that the harmless error standard is met here, and could not conclude that there is no reasonable probability that a single juror might have spared Michaels had the confession and the note been excluded at the penalty phase.

# COUNSEL

Benjamin L. Coleman (argued), Coleman & Balogh LLP, San Diego, California; Michael R. Belter, Law Office of Michael R. Belter, Monterey, California; for Petitioner-Appellant.

Michael T. Murphy (argued), Deputy Attorney General; Holly D. Wilkens, Supervising Deputy Attorney General; Julie L. Garland, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Kamala D. Harris, Attorney General; Attorney General's Office, California Department of Justice, San Diego, California; for Respondents-Appellees.

**PER CURIAM:**

Kurt Michaels was convicted and sentenced to death in California for the 1988 murder of JoAnn Clemons. On appeal from the district court's denial of his federal habeas petition, Michaels raised sixteen claims, two of which are uncertified. Reviewing his appeal under the deferential standards established in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), *see* 28 U.S.C. § 2254(d), we affirm the district court with respect to all claims. This per curiam opinion addresses all issues except the penalty phase prejudice. The accompanying separate opinion and dissent address penalty phase prejudice.

## I. Background

### A. Murder of JoAnn Clemons

In the fall of 1988, twenty-two-year-old Kurt Michaels lived in an apartment in Oceanside, California, with four roommates. At the time, Michaels was dating sixteen-year-old Christina Clemons, then confined at Broad Horizons, an adolescent rehabilitation facility. Christina's mother JoAnn Clemons lived nearby, in Escondido.[1] Christina testified at trial that she had been physically and sexually abused by her mother from an early age. As recently as that September, Christina

---

[1] We refer to the victim JoAnn Clemons as "Clemons" and to Christina Clemons by her first name.

said, her mother struck her with a cast iron pan and forced her to engage in digital penetration and oral sex.

While on release from Broad Horizons for the weekend to stay with her mother in early September, Christina obtained a key to her mother's apartment. On September 29, Christina was again released from Broad Horizons for the weekend. This time, she went to visit Michaels in Oceanside. While there, Christina decided that she "wasn't going to go through it anymore," and told Michaels that she wanted her mother killed. Christina warned Michaels that she would commit suicide if Clemons were not killed. Velinda Davis, one of Michaels's roommates, overheard Michaels tell Christina, "Now we can knock off the old lady." According to Davis, Christina replied, "And then we can get the money." Christina gave Michaels her key to Clemons's apartment.

The next evening, Michaels asked Mark Hebert, another roommate, if he wanted to go to Escondido to do a "tax." According to Hebert, doing a "tax" referred to collecting a debt, usually through the use of force or the threat of force. Michaels promised Hebert some of the proceeds of the "tax," and Hebert agreed to participate. Michaels also recruited roommate Darren Popik to come along. Michaels told Popik that Clemons had $100,000 in life insurance coverage, which would go to Christina, and that these insurance proceeds would help Michaels and Christina start a new life. Michaels promised Popik $2,000 to $5,000 from the

2

proceeds of Clemons's life insurance policy, as well as whatever was found in Clemons's apartment. Hebert and Popik arranged for an acquaintance, Joseph Paulk, to drive the getaway car after the "tax."

On the night of October 1,[2] Michaels and Popik left the Oceanside apartment, telling Davis that they were going to "tax" someone. At the last minute, Hebert decided not to participate. After Michaels and Popik left, Davis noticed that one of her kitchen knives was missing.

Dennis Crone, Michaels's former neighbor, testified that Michaels and Popik visited him at around 7:30 p.m. Michael Crawford, Dennis Crone's brother-in-law, spent time with Michaels and Popik at Crone's home and later gave them a ride to an intersection about a mile and a half away from Clemons's apartment building. Michaels and Popik stayed outside Clemons's apartment complex for two or three hours, waiting for Clemons to go to sleep. Michaels then used the key Christina had given him to enter the apartment; Popik accompanied him. When Michaels entered Clemons's bedroom, he tripped, waking Clemons. Popik initially tried to flee, but Michaels prevented him from leaving. Popik then began striking Clemons repeatedly in the face, and Michaels stabbed Clemons in the back with a knife,

---

[2] Both the California Supreme Court and Michaels's opening brief misidentified the date of the murder as October 3, 1988. *See People v. Michaels*, 28 Cal. 4th 486, 500 (2002). Clemons was in fact murdered in the early hours of October 2.

3

breaking it. Popik went into the kitchen and brought back another knife. Michaels used that knife to cut Clemons's throat.

Shortly after midnight, Clemons's neighbors heard sounds of a struggle coming from her apartment and called the police. When officers arrived, a neighbor told them that she had earlier seen two men walking toward Clemons's apartment. The officers knocked on the door of Clemons's apartment while Michaels and Popik were still inside, but the two escaped via a balcony. Entering the apartment, officers found Clemons's body in the bedroom. Popik was arrested near the apartment complex, but Michaels escaped in the getaway car driven by Paulk.

After leaving the crime scene, Michaels went to Camp Pendleton, a nearby Marine base, to visit two acquaintances, Rodney Hatch and Leon Madrid. Michaels told Hatch that he had cut a woman's throat during a robbery; he informed Madrid and two other witnesses that he was running from the law and "made a motion across [his] throat with his finger" when asked if he killed someone.

Two weeks later, police arrested Michaels while he was working at a nearby carnival. Michaels was interrogated soon after his arrest by detectives Allen and Gaylor. Michaels confessed during the interrogation that he had murdered Clemons and described the crime in detail. He told interrogators that he had killed Clemons "so Christina would not have to go back with her mother." Michaels eventually

signed a statement saying that he had killed Clemons so Christina would not be forced to live with her mother and "revert to her old habits and problems." The admissibility of large parts of that confession is a major issue in this appeal.

## B. State Trial and Direct Appeal

Michaels was charged with (1) the capital murder of Clemons with four special circumstances (financial gain, lying in wait, robbery, and burglary); (2) robbery; and (3) burglary. All three counts alleged the use of a knife and the infliction of great bodily injury.

The trial court initially appointed attorneys James Burns and Charles Duff to represent Michaels. Before trial, Burns was relieved due to conflicts with Michaels, and Duff was relieved for "personal reasons." In their place, the trial court appointed attorneys Richard Grossberg and Mark Chambers. Soon after the new appointments, Michaels filed two motions to remove Grossberg as lead counsel, contending that Grossberg was providing ineffective representation, and Grossberg moved to be relieved from the case. The trial court denied both motions. Michaels, unwilling to work with Grossberg, moved to represent himself. Michaels was permitted to proceed pro se, but Chambers and Grossberg remained on the scene as advisory counsel. As it turned out, Chambers conducted the entirety of the defense case; Grossberg did not participate in the trial. *People v. Michaels*, 28 Cal. 4th 486, 521 (2002) ("*Michaels I*").

5

Michaels's case proceeded to trial in April 1990. The only contested issues at the guilt phase were the degree of the murder, whether Michaels committed robbery and burglary, and whether the special circumstances were satisfied. Michaels maintained that he had killed Clemons to protect Christina from continued sexual and physical abuse by her mother; the prosecution argued that Michaels's motive was stealing Clemons's property and allowing Christina to collect the proceeds of her mother's life insurance policy. *Id.* at 501. The jury convicted Michaels on all counts and found all the alleged special circumstances true. *Id.* at 500.

The prosecution devoted most of the penalty phase to Michaels's criminal history and past misconduct, which included misdemeanor convictions for the theft of firearms from a neighbor as a juvenile, illegal possession of weapons, threatening Chad Fuller, and participating in the robbery of Chad Fuller, as well as multiple arrests. Chad Fuller testified about how Michaels had threatened him with a gun on one occasion, and a week or two later had helped two other men rob him. Fuller also testified that Michaels had returned much of the stolen property. Michaels's childhood neighbor testified that, as a teenager, Michaels had stolen his car and gun but later returned them. A childhood friend testified that, as a teenager, Michaels had shown him a revolver. The prosecution played a tape of Michaels's interrogation in full, and also introduced two pieces of paper on which Michaels

6

had written lists of names, characterizing each document as a "hit list." These lists were admitted to show that Michaels sought a reputation as a professional killer, not that he intended to kill anyone on the lists. *Michaels I*, 28 Cal 4th. at 534

In mitigation, Michaels's sister and mother testified that Michaels's father was a violent alcoholic who beat him and his mother; that he witnessed his father sexually molesting his sister when she was young; and that he had attempted suicide at age eleven. Michaels's family moved frequently to avoid his father, but his father continued to harass the family, and worse—Michaels's father tried to run over the children with his car and to kidnap them. Christina's foster mother also testified, recounting that she had seen Clemons engage in inappropriate sexual behavior with Christina. Finally, Michaels introduced testimony from a clinical psychiatrist, who stated that Michaels suffered from major depressive disorder, latent schizophrenia, and mixed personality disorder.

The prosecution's sole evidence on rebuttal was a note Michaels had handed to his lawyers, James Burns and Charles Duff, during the preliminary hearing stating that he would commit violence against his then-codefendant Popik if Popik was not reseated away from Michaels.

After penalty phase closing arguments, the jury deliberated for three days before returning a death verdict.

7

On automatic appeal, the California Supreme Court affirmed Michaels's conviction and sentence. *Michaels I*, 28 Cal 4th at 542. The United States Supreme Court denied certiorari. *Michaels v. California*, 538 U.S. 1058, 1058 (2003).

## C. State and Federal Habeas Proceedings

In 1998, while his direct appeal was pending, Michaels filed a state habeas petition with the California Supreme Court. The Court denied that petition in a one-page summary order.

Thereafter, Michaels filed a federal habeas petition in the U.S. District Court for the Southern District of California. The district court concluded that several of the claims in the petition were unexhausted and granted a stay to allow Michaels to exhaust those claims. Michaels then filed a second state habeas petition with the California Supreme Court, which was denied in a one-page summary order.

After exhausting his claims in state court, Michaels filed an amended federal habeas petition. In a series of decisions, the district court denied each of Michaels's claims on the merits. It also found that several of Michaels's claims had been procedurally defaulted but did not address whether cause and prejudice existed to excuse the defaults, instead addressing the merits of those claims. In February 2015, the district court entered judgment denying Michaels's petition on the merits,

granted a stay of execution, and certified twenty-three issues for appeal. Michaels

timely appealed, raising fourteen certified and two uncertified issues.[3]

## II. Standard of Review

## A. The AEDPA Framework

Michaels filed his federal habeas petition after AEDPA's effective date, so

AEDPA deference applies to claims adjudicated on the merits in state court. *See*

*Lindh v. Murphy*, 521 U.S. 320, 326 (1997). We may grant a habeas petition

challenging a state conviction only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). These standards are "highly deferential" to the state court.

*Davis v. Ayala*, 576 U.S. 257, 269 (2015).

> A state court's decision is contrary to clearly established federal law if its decision contradicts the governing law articulated by the Supreme Court or reaches a result different than that reached by the Supreme Court on materially indistinguishable facts. *See Terry Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court's decision is an unreasonable application of clearly established federal law when the

---

[3] Michaels raises the two uncertified issues in his opening brief. We construe the briefing of those issues as a motion to expand the certificate of appealability, U.S. Ct. of App. 9th Cir. R. 22-1(e), but deny certification. The claims referenced throughout this opinion are the fourteen certified claims argued in Michaels's briefing.

> state court identifies the correct legal rule, but applies it to a new set of facts in a way that is objectively unreasonable. *See id*. at 407.

*Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). "[W]e may only hold that a state court's decision was based on an unreasonable determination of the facts if 'we [are] convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.'" *Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)). In other words, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Where the state court adjudicated the merits of a claim in a summary decision rather than a reasoned opinion, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id*. at 98.

Although AEDPA sets a formidable standard, "[d]eference does not by definition preclude relief. A federal court can disagree with a state court's . . . determination and, when guided by AEDPA, conclude the decision was unreasonable." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). If the petitioner does manage to surmount the hurdles of § 2254, we then resolve the entire claim de novo, including any issues the state court did not reach because of the wrong

10

turn it took, "without the deference AEDPA otherwise requires." *Liao v. Junious*, 817 F.3d 678, 688 (9th Cir. 2016) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)).

## B. Retroactivity of AEDPA

Michaels first raises a supervening argument—that § 2254(d) should not apply to his case at all.[4] He recognizes that § 2254(d) applies as a statutory matter but contends that such an application is unconstitutionally retroactive, in violation of the Due Process Clause.

This contention rests on a mistaken understanding of retroactivity. A statutory provision's application is considered retroactive only if "the new provision attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994); *see id.* at 269-70. Where a federal statute is retroactive in that sense, due process concerns arise because the Fifth Amendment's Due Process Clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Id.* at 266.

---

[4] Michaels also contends in passing that 28 U.S.C. § 2254(e), which limits federal court authority to conduct evidentiary hearings, and § 2253, which requires federal petitioners to secure a certificate of appealability before proceeding with an appeal, are unconstitutionally retroactive as applied to his case. We reject these arguments for the same reason we reject his argument regarding § 2254(d).

11

Michaels identifies no events completed before the enactment of AEDPA to which § 2254 "attach[ed] new legal consequences." *Id*. at 270. Michaels argues that the relevant "event" to which legal consequences attached is the automatic appeal of his capital sentence in state court, which occurred before AEDPA's effective date. But nothing in AEDPA affected the automatic appeal. Section 2254(d) "place[d] a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). The provision attached new legal consequences to petitions for federal habeas relief, not to Michaels's state court litigation. That litigation was resolved on state law grounds and substantive rules of constitutional law, both unaffected by AEDPA.

For similar reasons, Michaels's attempt to analogize his case to *Ixcot v. Holder*, 646 F.3d 1202 (9th Cir. 2011), is unavailing. *Ixcot* held impermissibly retroactive the application of a statute disqualifying immigrants who illegally reenter the country from certain forms of discretionary relief. In *Ixcot*, the petitioner had taken affirmative steps to seek such relief before the law's effective date. *Id*. at 1209-10. Michaels's case is not like *Ixcot*, as Michaels did not take

affirmative steps to seek federal habeas relief—the relevant form of relief as to which AEDPA created new legal limitations—before AEDPA was enacted.[5]

The Supreme Court has unequivocally held that AEDPA applies to federal habeas petitions filed after the statute's effective date, *Woodford v. Garceau*, 538 U.S. 202, 205-06 (2003); *Lindh*, 521 U.S. at 326, and on numerous occasions has applied § 2254(d) to cases in which the state court appeals began prior to that law's enactment. *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 177, 181 (2011); *Wiggins v. Smith*, 539 U.S. 510, 516, 520 (2003). In this case as well, § 2254(d) constitutionally applies to the claims adjudicated on the merits by the state court before AEDPA's effective date.

### III. Admission of Michaels's Taped Confession

**A. Background**

Detectives Allen and Gaylor interrogated Michaels shortly after his arrest a few weeks after the murder. During the two-and-a-half-hour taped interrogation, Michaels confessed to murdering Clemons. Claim Three challenges, under *Miranda v. Arizona*, 384 U.S. 436 (1966), the admission of the confession at both

---

[5] Although the exhaustion and procedural default doctrines that required Michaels to pursue his claims in state court before filing a federal habeas petition may have affected Michaels's state appeal, those doctrines preexisted AEDPA. *See, e.g.*, *Picard v Connor,* 404 U.S. 270, 275 (1971); *Lambrix v. Singletary*, 520 U.S. 518, 522-23 (1997).

the guilt and penalty phases of trial, on the ground that the confession was elicited after Michaels invoked his rights to counsel and to silence.[6]

The detectives' interrogation of Michaels began as follows:[7]

Allen:      This is Kurt Michaels [defendant]. No middle name.

Gaylor:     Kurt, what's your middle name? None.

Michaels:   Legal [name is] changed for the third time.

Gaylor:     Where does your family live, Kurt?

Michaels:   Who knows honestly? I wish I knew or I'd be with them now. I'd be able to get the other pictures in my other coat.

Gaylor:     Well, I'll tell you. I've been doing this for about twelve years. John's been doing this for about thirteen years, here. And a couple of years with the San Diego Police before that. And a few years with the Highway Patrol before that. And if there's one thing we know, it's that there's always more than one side to every story. So what we want to do is provide you with an opportunity to tell your side of the story, because this last two weeks, we've been talking with a lot of different people and have gotten a lot of different information from different people.

Michaels:   You found out I am a mental case. (Laughter.)

Gaylor:     So, now it's your turn to tell your side of the story. Okay? Also, if you have any questions, it will be your opportunity to ask them, all right? Before we do that, though, I want to read you your rights. [Reads standard

_____

[6] Claim Two argues that we should first adjudicate each of Michaels's claims on the merits and remand to the district court if there is a question regarding procedural default. As will become clear once we address all the claims, remand for such a determination is unnecessary.

[7] Except the italicizations, all alterations noted appear in the original transcript.

14

Miranda warnings.] Do you understand each of these rights I've explained to you? (Defendant nods his head yes.) Is that yes?

Michaels:   Yes.

Gaylor:   Okay. Having in mind and understanding your rights as I've told you, are you willing to talk with us?

Michaels:   Sure. No problem.

Gaylor:   Do you know why you're here?

Michaels:   Yes.

Gaylor:   Tell me, in your own words.

Michaels:   Murder.

Gaylor:   Murder of who?

Michaels:   Murder of JoAnn Clemons.

Gaylor:   Well, what's your side of the story? What happened?

Michaels:   *I don't know if I should without an attorney.* (Laughter.) It ain't going to do me no . . . . (Laughter.)

Allen:   Well, we need to know. Let's put it this way, Kurt. He just advised you of your rights. And you said, that yeah, you wanted to talk to us. There's no problem. If at any time that you do not want to talk with us, you can stop at any particular time. If there's any time that we ask you a question that you don't want to answer, you can stop at any time.

Michaels:   *Okay, that one.* (Laughter.)

Allen:   Well, what I'm saying is that we just want to make sure you understand all those things.

Michaels:   Okay, I appreciate it.

15

Allen:	And the other thing that Chuck said was we have uh pretty much understand what the story is and we like to going to give you your opportunity.

*Michaels I*, 28 Cal 4th. at 508-09.

Following this exchange and additional questioning by the interrogators, Michaels proceeded to confess in detail to his involvement in the homicide. He revealed that he enlisted Popik for the murder, and that the two of them waited outside Clemons's apartment for her to go to sleep. Michaels stated that after they entered the apartment, Clemons woke up, Popik physically beat her, and "I cut her throat." Michaels told interrogators that he killed Clemons "so Christina would not have to go back with her mother." Michaels also made statements suggesting that he had killed "more than twenty" people.

Detective Allen was skeptical of Michaels's remarks about his other murders, stating "I think you're making this up." Later, Detective Allen asked, "[s]o a lot of this is what you're telling us has to do with you and your reputation on the street is not really true?" Michaels answered, "right . . . I have to keep that story alive." No evidence was presented at trial indicating that Michaels had committed any other homicide.

In the guilt phase, the trial court admitted the portions of the interrogation in which Michaels confessed to his role in the Clemons murder but excluded his comments about committing other murders. In the penalty phase, though, the trial

court admitted the entire taped interrogation. The jury was specially instructed that Michaels's comments about other killings were to be considered only as proof of his mental state in connection with the charged murder, not for their truth. After hearing the taped interrogation and the other evidence presented, the jury sentenced Michaels to death.

## B. *Miranda*

*Miranda v. Arizona* established the bedrock Fifth Amendment principle that a court cannot admit statements obtained during the custodial interrogation of a suspect unless certain procedural safeguards are met. 384 U.S. at 444. Those safeguards include informing the suspect of his rights to remain silent and to receive assistance of counsel before any questioning. *Id.* Any waiver of those rights must be voluntary, knowing, and intelligent. *Id.* Recognizing that "the authorities through badgering or overreaching—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused," *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (quotations and alterations omitted), the Supreme Court clearly established a bright line safeguard: If a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent," officers must cease the interrogation. *Miranda*, 384 U.S. at 473-74. The Court later clarified that an invocation of a suspect's *Miranda* rights must be "unambiguous." *Davis v. United States*, 512 U.S. 452, 459 (1994); *see infra* pp. 21-22.

17

Any unambiguous invocation of the right to remain silent must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (quoting *Miranda*, 348 U.S. at 479). *Miranda* elaborated on the consequences of failing to respect a suspect's invocation, explaining that a proper waiver was a "prerequisite[] to the admissibility of any statement made by a defendant." *Miranda*, 384 U.S. at 476.

It is also clearly established that just as a suspect in custody may refuse to answer all questions, he may selectively exercise his *Miranda* rights to silence and to counsel. The purpose of *Miranda*'s prophylactic protections is to "counteract[] the coercive pressures of the custodial setting," *Mosley*, 423 U.S. at 104, by "giving the *defendant* the power to exert some control over the course of the interrogation," *Moran v. Burbine*, 475 U.S. 412, 426 (1986) (emphasis in original). "The mere fact that [a suspect] may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries." *Miranda*, 384 U.S. at 445.

After *Miranda*, *Michigan v. Mosley* considered how these principles apply in practice—specifically, whether suppression of a defendant's homicide confession during an interrogation was required after he had refused to answer questions about unrelated robberies in a previous interrogation. 423 U.S. at 104. *Mosley* first explained that "[t]hrough the exercise of his option to terminate questioning[, a

18

suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* at 103-04. *Mosley* then held that the defendant had selectively invoked his right to cut off questioning regarding the robberies. But, *Mosley* held, the defendant's confession to the homicide was admissible because the confession was unrelated to the robberies, and the defendant had not invoked his right to silence as to the homicide. *Id.* at 105.

*Connecticut v. Barrett*, 479 U.S. 523 (1987), confirmed that selective invocations of *Miranda* rights must be honored. *Barrett* concerned the right to counsel. But "[t]here is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel . . . ." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

*Barrett* involved a defendant who provided an oral confession after stating that "he would not give the police any written statements [without counsel] but had no problem in talking about the incident."479 U.S. at 525. The Court held that the defendant's refusal to provide a written statement constituted a "limited invocation of the right to counsel," *id.* at 530, which triggered constitutional protections: "It is undisputed that [the defendant] desired the presence of counsel before making a written statement. Had the police obtained such a statement without meeting the waiver standards of *Edwards*, it would clearly be inadmissible." *Id.* at 529. The

19

invocation of the right to counsel with regard to a written statement did not, however, affect the admissibility of the oral confession, as to which the defendant had voluntarily announced his willingness to speak with authorities without counsel. *Id.*

*Mosley* and *Barrett* clearly established that when a suspect selectively invokes his right to silence or to counsel, *Miranda* requires interrogation to end with respect to the subject matter or mode of reply as to which the suspect invoked the right. *See Mosley*, 423 U.S. at 103-04; *Miranda*, 384 U.S. at 473-74. We so recognized in *Arnold v. Runnels*, concluding that "[a]ny reasonable application of the law must begin by recognizing that [the defendant] clearly and unequivocally invoked his *Miranda* rights selectively."[8] 421 F.3d 859, 864 (9th Cir. 2005) (citing *Mosley*, 423 U.S. at 103-04; *Barrett*, 479 U.S. at 529). *Arnold* went on to hold, under deferential AEDPA review, that admission of the defendant's taped interview was unconstitutional because he had selectively invoked his right to silence as to audio-recorded statements. *Id.* at 866.[9]

---

[8] Under AEDPA review, "an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

[9] This Court's decision in *United States v. Garcia-Morales*, 942 F.3d 474 (9th Cir. 2019), has no bearing on this case. *Garcia-Morales* held that the district court did not err in admitting an exchange between Garcia-Morales and an

20

That an individual in custody can selectively invoke his *Miranda* rights does not obviate the requirement that a suspect must invoke any *Miranda* right unambiguously and unequivocally to trigger its protection. *See Berghuis*, 560 U.S. at 381-82; *Davis*, 512 U.S. at 459. More specifically, the relevant clearly established Supreme Court law is as follows:

> First, an unambiguous and unequivocal *Miranda* invocation "cuts off" questioning—even questioning intended to clarify that the accused is invoking his *Miranda* rights. *See Berghuis*, 560 U.S. at 382 (explaining that if the accused makes a "simple" statement that he wants to remain silent, he invokes "his right to cut off questioning" (internal quotation marks omitted)); *Smith*, 469 U.S. at 98 ("Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease."). Second, an ambiguous or equivocal *Miranda* invocation "do[es] not require the cessation of questioning." *Davis*, 512 U.S. at 459. Finally, in determining whether a request is ambiguous or equivocal, the court must apply an objective inquiry: "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present [or to remain silent] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (internal quotation marks and citation omitted).

---

interrogating police officer which "demonstrated that Garcia did not want to discuss his co-conspirators on video tape," because the exchange did not constitute a selective invocation of Garcia-Morales's right to remain silent. 942 F.3d at 476-77. Garcia-Morales never made any statements regarding his co-conspirators, the subject he had allegedly invoked his right not to answer questions about. Instead, Garcia-Morales argued that admission at trial of the alleged invocation itself was plain error, relying on *Doyle v. Ohio*, 426 U.S. 610, 617-19 (1976), and its progeny, which hold that the prosecution violates due process in eliciting testimony about a suspect's silence. 942 F.3d at 476. In this case, Michaels was not harmed by the admission of his invocation ("okay, that one"), but by the admission of the testimony regarding the subject as to which he invoked his right to remain silent ("what happened"). *Garcia-Morales* is therefore inapt.

*Garcia v. Long*, 808 F.3d 771, 778 (9th Cir. 2015).

## C. AEDPA Review of State Court Decision

On direct appeal, the California Supreme Court held that the interrogating officers did not violate Michaels's right to counsel or his right to silence with respect to all questioning because Michaels did not unequivocally invoke either right. *Michaels I*, 28 Cal. 4th at 510-11. The full analysis of the issue was as follows:

> Defendant's statement, "Okay, *that one*" implies a refusal to answer a particular question, perhaps Detective Gaylor's question asking defendant: "[W]hat's your side of the story? What happened?" *Defendant did not assert a right to refuse to answer any questions, ask that the questioning come to a halt, or request counsel.* Instead, he was showing that he knew he could refuse to answer any or all questions and would exercise this right on a question-by-question basis. From time to time in the interrogation he did refuse to answer specific questions. But the words defendant used, and his subsequent conduct, do not show that *he wanted to stop the interrogation and bar all further questions.*
>
> The case is analogous to *People v. Silva*, 45 Cal.3d 604 (1988). There, the defendant waived *Miranda* rights and answered several questions, then refused to answer a question that might place him at the site where the murder victim was kidnapped. The interrogation continued, with the defendant answering some questions and not others. We concluded that the defendant's constitutional rights were not violated, because "[a] defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.'" *Id.* at 629-630. The same is true here.

*Michaels I*, 28 Cal. 4th at 510-11 (emphasis added) (alterations in original).

The state court's conclusion that Michaels did not unambiguously invoke either his right to counsel or his right to silence with respect to all questioning is fully supported by the record. *See id.* at 510.

First, Michaels's statement "I don't know if I should without an attorney" is ambiguous under *Davis v. United States*, 512 U.S. 452 (1994). *Davis* held that the statement "[m]aybe I should talk to a lawyer" did not constitute an unambiguous request for counsel. *Id.* at 462. Similarly, Michaels did not unambiguously invoke his right to counsel when he equivocated about whether he should speak without a lawyer present.

Second, Michaels never requested that all questioning come to a halt. In response to an interrogating officer informing him that he could choose to stop answering any question at any time, Michaels stated, "Okay, that one." That response cannot reasonably be interpreted to be a general refusal to answer questions. The term "that" refers to "*a* fact, act, or occurrence, or *a* statement or question, implied or contained in the previous sentence." *That*, Oxford English Dictionary (2d ed. 1989) (emphasis added). So the pronoun "that" in context referred to a specific inquiry, not to all inquiries.

At the same time, the California Supreme Court recognized that Michaels did invoke the selective right to silence protected by *Miranda*. *Michaels I* held that "[d]efendant's statement, 'Okay, *that one*' implies a refusal to answer a particular

23

question, perhaps Detective Gaylor's question asking defendant: '[W]hat's your side of the story? What happened?'" 28 Cal. 4th at 510 (alterations in original). *Michaels I* reasoned further that Michaels's "case is analogous to *People v. Silva*, [45 Cal. 3d 604 (1988)]" which involved a defendant who refused to answer a specific question during his interrogation. *Michaels I*, 28 Cal. 4th at 510. Quoting the holding in *Silva*—"[a] defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress,'" 45 Cal. 3d at 629 (citation omitted)—*Michaels I* concluded, "[t]he same is true here." 28 Cal. 4th at 511.[10] By equating Michaels's case to *Silva*, *Michaels I* confirmed that it considered Michaels's statement to be a refusal to answer a particular question.

Despite its correct premise that Michaels had selectively invoked his right not to answer a specific question, *Michaels I* stopped there. It neither determined precisely what question Michaels had declared off limits nor whether the ensuing interrogation impermissibly violated Michaels's invocation of his right to silence with regard to the subject covered by that question. Yet, as *Miranda* and the ensuing precedents clearly establish, when a suspect unequivocally invokes his

---

[10] We note that the officers in *Silva* respected the suspect's selective invocation and "asked questions involving areas other than the [subject of the invocation]." 45 Cal. 3d at 629. In contrast, the officers in this case ignored Michaels's selective invocation and continued to ask him about the murder.

*Miranda* rights "the interrogation must cease." *Miranda*, 384 U.S. at 474. In the context of selective invocation of the *Miranda* right to silence, the cessation requirement means that police officers cannot continue to ask about the same subject the suspect said he did not want to talk about. *Michaels I* did not so recognize.

Instead, *Michaels I* indicated that Michaels had to invoke his selective right to silence "on a question-by-question basis," even if he had previously declared a subject matter off limits by declining to answer a broad question about it. 28 Cal. 4th at 510. *Michaels I*'s decision to ignore a defendant's unambiguous and unequivocal selective invocation of his right to silence as to an area of inquiry during a custodial interrogation, requiring instead that the refusal be repeated in response to each question regarding the subject matter as to which the right was earlier invoked, was contrary to the law clearly established by *Miranda* and its progeny. *See Mosley*, 423 U.S. at 103-04; *Miranda*, 384 U.S. at 473-74.

## D. De Novo Review of Michaels's *Miranda* Claim

Because the California Supreme Court's decision rested on an application of *Miranda* contrary to clearly established federal law, we review de novo the aspects of Michaels's selective invocation of *Miranda* claim. *See Panetti*, 551 U.S. at 953.

*Michaels I*'s conclusion that Michaels selectively invoked his right to silence is correct. *Michaels I* held that "[d]efendant's statement, 'Okay, *that one*' implies a

25

refusal to answer a particular question, perhaps Detective Gaylor's question asking defendant: '[W]hat's your side of the story? What happened?'" 28 Cal. 4th at 510 (alterations in original). Although *Michaels I* used the word "perhaps," once one recognizes—as *Michaels I* does—that he was refusing to answer *some* question, the last preceding questions "What's your side of the story? What happened?" are the only possible questions to which Michaels could have been referring.

"In light of clear Supreme Court precedent, we have recognized the importance of evaluating a suspect's in-custody statements as a whole." *Sessoms v. Grounds*, 776 F.3d 615, 627 (9th Cir. 2015) (en banc). In context, the phrase "Okay, that one" is susceptible to only one reasonable interpretation, as an unambiguous invocation of the right that he was just informed of—to "stop [talking] at any particular time" —with respect to the last question he was asked: "Well, what's your side of the story? What happened?" This question was the only substantive question, and the last question, asked. By selectively invoking his right to remain silent in response to this broad question, Michaels stated that he did not want to discuss "what happened" with regard to the murder. Although Michaels did not repeat the question in his own words, the reference is clear.

Michaels did go on to answer questions regarding the subject he had declared off-limits—his version of how the murder occurred. But "an accused's *postrequest* [sic] responses to further interrogation may not be used to cast doubt

26

on the clarity of his initial request for counsel." *Smith*, 469 U.S. at 92 (emphasis added); *see also Garcia*, 808 F.3d at 778. Thus, Michaels's subsequent answers to detectives' questions cannot undermine his otherwise unambiguous invocation of his right to silence, contrary to *Michaels I*'s analysis. 28 Cal. 4th at 510-11.

Following Michaels's unambiguous, unequivocal invocation of his selective right to silence, the interrogating officers should have ceased asking him about "What's your side of the story? What happened?" *See Miranda*, 384 U.S. at 473-74. In *Mosley*, for example, an invocation of a right to silence was "scrupulously honored" when police "immediately ceased the interrogation" and "restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 423 U.S. at 104, 106. Here, however, Detective Allen ignored Michaels's invocation and proceeded along precisely the same line of questioning: "We're like going to give you your opportunity . . . to understand your side of the story." The detectives then continued to ask Michaels questions about "his story" regarding the murder and the events leading up to it. After a battery of questions, Michaels eventually confessed that he planned to murder Clemons and that he stabbed her to death on October 2, 1988.

Admission at trial of the parts of the taped interrogation that did not relate to Michaels's involvement in the murder—his comments about killing others, for example, and the discussion of his relationship with Christina—did not violate

27

*Miranda*, as Michaels did not unambiguously invoke his rights to silence or to counsel with respect to all questioning. But the detectives' continued questioning regarding Michaels's role in the murder after Michaels's selective invocation did violate his *Miranda* rights. Admission of the parts of the interrogation in which Michaels confessed to "what happened," was constitutional error.

**E. Harmless Error**

Admission of evidence in violation of *Miranda* requires reversal of a defendant's conviction and sentence only if the error likely had a "substantial and injurious effect or influence in determining the jury's verdict." *Sessoms*, 776 F.3d at 629 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "If, reviewing the facts as a whole, we are able to determine with fair assurance that the judgment was not substantially swayed by the error, we may conclude that the error was harmless. Otherwise, we must conclude that the petitioner's rights were substantially and injuriously affected." *Hurd v. Terhune*, 619 F.3d 1080, 1090 (9th Cir. 2010) (citation omitted). Because it held there was no *Miranda* violation, the California Supreme Court made no determination as to whether any such error was harmless. So we review this element of Michaels's claim de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam).

Ordinarily, a defendant's own confession is "the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499

28

U.S. 279, 296 (1991) (quotation marks omitted). When the jury considers a full confession, there is a high probability that it will rely on the confession alone in rendering its decision. *Id.* An erroneously admitted confession "will seldom be harmless." *United States v. Williams*, 435 F.3d 1148, 1162 (9th Cir. 2006) (citing *Fulminante*, 499 U.S. at 296).

But seldom does not mean never. In this case, the evidence presented at trial showing that Michaels committed capital murder was overwhelming even without the confession. The *Miranda* violation was therefore harmless as to the guilt phase. The separate opinions in this case address harmlessness under *Brecht* during the penalty phase.

### 1. *Guilt Phase*

At the guilt phase of Michaels's trial, a mountain of witness testimony aside from the taped confession indicated that Michaels had committed capital murder. First, three of Michaels's roommates who spent time with him less than forty-eight hours before the murder testified either that Michaels directly told them about his plans to kill Clemons or that they overheard Michaels speak about his plans do so. Roommate Mark Hebert testified that Michaels had asked him to help "tax" Clemons while making a gesture with his hand that resembled slitting her throat. Hebert explained that "tax" referred to collecting a debt by force. Velinda Davis, another roommate, testified that she heard Michaels tell Christina that he would

29

"knock off the old lady." On the evening of the murder, Davis saw Michaels and Popik take steps to alter their appearance and heard them say they were going to "tax someone." Davis later realized that her kitchen knife was missing. Kimberly Platt, also a roommate, testified that Michaels told her he was going to "tax [an] old lady."

Other testimony placed Michaels in Clemons's apartment at the relevant time. Michael Crawford testified that, on the evening of the murder, he saw Michaels and Popik walking on the side of the street and offered them a ride. He dropped them off approximately a mile and a half from Clemons's apartment a few hours before the murder. Kimberly Anderson, who lived on the same floor as Clemons, testified that she came home at midnight on the night of the murder and saw Michaels and Popik walking toward Clemons's apartment.

The prosecution also introduced strong circumstantial evidence that Michaels murdered Clemons. Hair found in Clemons's hand matched Michaels's hair color, width, and structure. A crime scene reconstructionist testified that the killer would have had a lot of blood on his clothing, effectively ruling out Popik as the killer because he did not have enough blood on him when he was arrested shortly after the murder. Hebert testified that he had arranged for Paulk to drive the getaway car for Michaels and Popik; Charles Merritt, from the crime lab, testified

that Michaels's identification, along with a belt buckle he was seen wearing the day before the murder, were found in Paulk's car.

Finally, the prosecution presented testimony from four witnesses to whom Michaels admitted, the night of the murder, killing a woman by cutting her throat. Rodney Hatch testified that Michaels said that he had sliced a woman's throat during a burglary. Dennis Lucas testified that Michaels told him and two other witnesses that Michaels "and another companion had killed his girlfriend's mother" and had "cut her throat with a knife." Leon Madrid's and Kim Burkhalter's testimony supported Lucas's account. The jury therefore would have heard a version of Michaels's confession of guilt through these witnesses even if the taped confession had been excluded.

In short, evidence concerning events before, during, and after the murder pointed to Michaels's guilt, as did circumstantial evidence found in connection with the crime. Michaels's taped confession, which recounted the murder and the events leading up to it in detail, confirmed what the witnesses and evidence already revealed, but, with respect to guilt (as opposed to details of the murder and motive), provided little additional information. Although confessions are powerful evidence, *Fulminante*, 499 U.S. at 296, the weight of the other evidence presented at trial overwhelmingly showed that Michaels murdered Clemons. We therefore conclude that the improper admission of his confession to the police did not have

31

"a substantial and injurious effect or influence on the jury" with regard to the guilt phase. *Brecht*, 507 U.S. at 623.

### 2. Sentencing Phase

Assessing the likely impact of the confession on the penalty phase of the trial, the members of this panel reach different conclusions, discussed in the accompanying opinion and dissent. The majority concludes that the impact of the confession on the penalty phase was harmless under *Brecht*.

### IV. Ineffective Assistance of Counsel for Disclosing Confidential Note to the Prosecution

#### A. Background

In Claim Four, Michaels argues that his trial lawyers provided ineffective assistance of counsel ("IAC") by disclosing to the prosecution a confidential note from Michaels to his lawyers. The note was presented, and its import emphasized, as aggravating evidence during the penalty phase.

Attorneys Burns and Duff represented Michaels in the early stages of his case, before it was severed from those of his codefendants Popik and Paulk. During the preliminary hearing on January 26, 1989, attended by all three defendants, Michaels handed his attorneys a folded handwritten note ("Popik note"). The note stated in part:

> [I] [r]equest each of the accused be put in separate handcuffs and that
> Mr. Popik sit at least one seat from his other co-defendants. There will

32

be great problems if this cannot be arranged as neither of his co-defendants are willing to restrain themselves from doing Popik bodily harm if forced to be locked up to him or sit next to him. Popik will be hurt if something can't be worked out.

Burns and Duff read the note, informed the court that a matter needed immediate attention, and, at an ex parte meeting, gave the judge the note. The court sealed the note and the transcript of the ex parte hearing, changed the seating arrangement of the codefendants, and continued with the preliminary hearing.

The Popik note remained sealed until after attorneys Duff and Burns were replaced by attorneys Chambers and Grossberg. On September 11, 1989, the defense and the prosecution jointly requested that the trial court unseal several previously sealed documents. Defense counsel "d[idn't] know what [the documents they were asking to unseal] were." The trial court granted that request, allowing the prosecution to view the contents of the Popik note for the first time.

During the penalty phase, the prosecution initially moved to offer the Popik note as aggravating evidence. The trial court ruled the note inadmissible. But, after Michaels offered testimony from three character witnesses to demonstrate that he was not dangerous, the trial court admitted the note as rebuttal evidence. Three witnesses testified about the Popik note, including Duff, Michaels's attorney who had read the note during the preliminary hearing. The Popik note was the last evidence the prosecution presented and the only matter covered during the

33

government's penalty phase rebuttal. The prosecution referred to the note in closing argument.

On direct appeal, Michaels argued that the trial court erred in admitting the Popik note as rebuttal evidence because it had been disclosed in violation of the attorney-client privilege. The California Supreme Court held that introduction of the Popik note violated the attorney-client privilege but was harmless. *Michaels I*, 28 Cal. 4th at 538.

Michaels raised the Popik note issue again on state post-conviction review in his second state habeas petition, this time as an IAC claim that his counsel violated attorney-client privilege by disclosing the note to the prosecution. The California Supreme Court rejected this claim in a summary order on the merits as untimely and successive, and because it could have been raised in Michaels's first state habeas petition. Michaels then raised the IAC claim in the district court, focusing almost entirely on the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984). To support his contention that trial counsel had provided deficient performance, Michaels succinctly explained that "[t]he Supreme Court of California held that [Michaels's] attorneys violated the attorney-client privilege by disclosing the note," and "[w]hen an attorney violates the attorney-client privilege, he has engaged in deficient performance under . . . *Strickland*."

34

The district court addressed the merits of Michaels's Popik note IAC claim "irrespective of the state supreme court's application of procedural bars." Noting that "it is questionable whether trial counsel's course of action 'falls within the wide range of reasonable professional assistance,'" the district court ultimately held that, applying AEDPA deference, Michaels's IAC claim failed under *Strickland*'s prejudice prong.

## B. Procedural Default

The government maintains that Michaels procedurally defaulted his Popik note IAC claim by failing properly to raise it in state court. Applying *Martinez v. Ryan*, 566 U.S. 1 (2012), we reject this contention.

Federal courts are precluded from reviewing a claim that has been procedurally defaulted "pursuant to an independent and adequate state procedural rule . . . unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). *Martinez* held that a petitioner can establish cause for the procedural default of a "substantial claim of ineffective assistance at trial" if "under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding" and "there was no counsel or counsel in that proceeding was ineffective." 566 U.S. at 17. A "state court's alternate ruling

on the merits of the IAC claim," as occurred here, "does not allow a federal court to ignore the procedural default ruling[;] it also does not bar a federal court from applying *Martinez*." *Apelt v. Ryan*, 878 F.3d 800, 827 (9th Cir. 2017). So our question at this juncture is whether Michaels's procedural default of his trial counsel IAC claim with regard to the Popik note is excused under *Martinez*.

First, as to whether *Martinez* applies at all, *Martinez*'s holding is applicable to the criminal judgments of states whose procedures require, as a practical matter even if not as a legal mandate, that petitioners raise claims of ineffective assistance in an initial-review collateral proceeding. *Trevino v. Thaler*, 569 U.S. 413, 417, 423 (2013). California is one such state. California "[a]ppellate jurisdiction is limited to the four corners of the record on appeal," *In re Carpenter*, 9 Cal. 4th 634, 646 (1995), yet trial counsel IAC claims often depend on evidence outside the trial record. Reflecting this limitation, the California Supreme Court has consistently held that "claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal." *People v. Lopez*, 42 Cal. 4th 960, 972 (2008); *see also People v. Wilson*, 3 Cal. 4th 926, 936 (1992); *People v. Pope*, 23 Cal. 3d 412, 426 n.17 (1979). Consistent with that edict, the California Supreme Court in this case rejected other trial counsel IAC claims Michaels raised on direct appeal, noting, "[w]e have repeatedly emphasized that a claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding." *Michaels*

36

*I*, 28 Cal. 4th at 526. California's procedural framework thus makes it "highly unlikely in a typical case" that direct appeal will offer a "meaningful opportunity" for review of trial counsel IAC claims. *Trevino*, 569 U.S. at 429; *see Woods v. Sinclair*, 764 F.3d 1109, 1137 (9th Cir. 2014) (applying *Trevino* and holding that Washington state law meets the *Martinez* requirement that IAC claims are to be raised in initial-review collateral proceedings). *Martinez* therefore applies.

As to whether the Popik note IAC claim was actually defaulted, Michaels argues that it was not because he raised a merits claim regarding the note on direct appeal. But even if Michaels's reference to the Popik note in his direct appeal could be understood as attempting to raise the IAC claim at that junction—which is doubtful—IAC claims in California, as noted, should generally be raised in the first habeas corpus petition. *Lopez*, 42 Cal. 4th at 972. Michaels did not raise the Popik note claim on initial state habeas review, as required by California law. The IAC claim was therefore procedurally defaulted.

## C. Application of *Martinez v. Ryan*

The district court rejected the Popik note claim on the merits for lack of *Strickland* prejudice and so did not address whether Michaels's default should be excused under *Martinez*. However, a conclusion on the merits of an ineffective assistance of trial counsel claim under *Strickland* holds a petitioner to a higher burden than required in the *Martinez* procedural default context, which only

requires a showing that the ineffective assistance of trial counsel claim is "substantial." *Martinez*, 566 U.S. at 17. That is especially true here, where we are required to apply AEDPA deference under 28 U.S.C. § 2254(d) to the state court's summary merits decision on the IAC claim, but not to the logically prior question whether the procedural default of that claim is excused under *Martinez*. *See Apelt*, 878 F.3d at 826-31 (applying AEDPA deference to a state court's rejection of a trial counsel IAC claim, but not to the *Martinez* analysis of whether ineffective post-conviction counsel excused the procedural default of the claim).

Additionally, we recognized in *Williams v. Filson* that IAC claims that sufficiently demonstrate counsel's deficient performance under *Strickland* but are insufficient to establish *Strickland* prejudice under AEDPA review are considered for their prejudicial effect in a cumulative error analysis. 908 F.3d 546, 570 (9th Cir. 2018). *Williams* held that the district court abused its discretion in denying an evidentiary hearing on an IAC claim regarding the failure to investigate and present evidence regarding Williams's childhood and remanded for a hearing to determine if Williams was prejudiced by his counsel's deficient performance. *Id.* 569-70. Relevant here is *Williams*'s direction that the district court's evidentiary hearing should also develop evidence regarding a different IAC claim—concerning the failure to present evidence of brain damage—even though, applying AEDPA deference, "it was not unreasonable for the Nevada Supreme Court to conclude that

38

[the] evidence did not, on its own, give rise to a reasonable probability that the outcome of the sentencing hearing would have been different." *Id.* at 564; 570-71. We explained that the "incremental impact" of counsel's deficient performance in failing to present evidence of brain damage, although not independently prejudicial under AEDPA review, was to be considered as part of a cumulative prejudice analysis. *Id.* at 570; *see also Alcala v. Woodford*, 334 F.3d 862, 893-94 (9th Cir. 2003) (holding it proper to consider prejudice of deficient performance of counsel, along with trial court errors, in a cumulative error analysis, without reaching the prejudice of each IAC claim individually).

Michaels raised a cumulative error argument with regard to the penalty phase in his habeas petition and now on appeal. Michaels's Popik note IAC claim is therefore relevant not only as an isolated claim. If Michaels has satisfied the *Martinez* requirements, and applying AEDPA deference, his counsel's performance was constitutionally deficient on the merits, that error is also potentially relevant in the context of cumulative error, independent of any isolated *Strickland* prejudice analysis under AEDPA.

We therefore address the *Martinez* issue regarding Michaels's Popik note IAC claim before turning to the merits of the deficient representation aspect of that claim under AEDPA.

Under *Martinez*, Michaels must prove both "cause" and "prejudice." 566

U.S. at 10. To demonstrate "cause," Michaels must show that "appointed counsel

in the initial-review collateral proceeding, where the claim should have been

raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S.

668 (1984)." *Id*. at 14. *Strickland* in turn requires a petitioner establish both (1)

counsel's deficient performance and (2) prejudice. 466 U.S. at 687. To demonstrate

prejudice under *Strickland*, the petitioner "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id*. at 694. "A reasonable probability is a

probability sufficient to undermine confidence in the outcome," not a probability

that the result "more likely than not" would have been different. *Id*. at 693-94.

To establish "prejudice" under *Martinez*, the underlying trial counsel IAC

claim must also be "a substantial one, which is to say . . . that the claim has some

merit." 566 U.S. at 14. Although the cause and prejudice requirements are distinct,

"[t]here is considerable overlap between these requirements, since each considers

the strength and validity of the underlying ineffective assistance claim." *Djerf v.

Ryan*, 931 F.3d 870, 880 (9th Cir. 2019).

We first address the prejudice prong of *Martinez* to determine whether

Michaels's claim of ineffective assistance of trial counsel is "substantial." *See

Dickinson v. Shinn*, 2 F.4th 851, 858 (9th Cir. 2021). We then evaluate the actions

of Michaels's post-conviction counsel with regard to the trial counsel Popik note IAC claim under *Strickland*, to determine whether Michaels satisfies the cause requirement of *Martinez*. Based on this analysis, we conclude that the procedural default of Michaels's IAC claim is excused under *Martinez*. *See Apelt*, 878 F.3d at 825.

### 1. *Ineffective Assistance of Trial Counsel and Prejudice Under* Martinez

Michaels contends that his trial counsel provided ineffective assistance by violating the attorney-client privilege, resulting in the disclosure to the prosecution of a damaging confidential communication. As the government recognized in its briefing, and as is clear from the record, Michaels mistakenly framed this IAC claim as an assertion that attorneys Burns and Duff, rather than Chambers and Grossberg, disclosed the Popik note to the prosecution. But Michaels has argued throughout his habeas proceedings that "giving the prosecution evidence" is what amounted to ineffective assistance of counsel. And, as we will discuss, both sets of attorneys breached of their duty of confidentiality; it was the actions of all of them, taken together, that resulted in the prosecution introducing the Popik note at trial. Michaels's misnaming of the specific attorneys who directly triggered the release of the Popik note to the prosecution does not affect our analysis.

### a. **Deficient Performance**

41

*McClure v. Thompson* held that "[t]he duty of an attorney to keep his or her client's confidences in all but a handful of carefully defined circumstances is so deeply ingrained in our legal system and so uniformly acknowledged as a critical component of reasonable representation by counsel that departure from this rule 'make[s] out a deprivation of the Sixth Amendment right to counsel.'" 323 F.3d 1233, 1242-43 (9th Cir. 2003) (quoting *Nix v. Whiteside*, 475 U.S. 157, 171 (1986)). *McClure* addressed whether a state court unreasonably denied a petitioner's claim that his defense counsel rendered ineffective assistance by revealing information about the location of kidnapping victims who may have still been alive when the petitioner told his attorney the information in confidence. *Id*. at 1236-37. Opining that "[t]here are few professional relationships 'involving a higher trust and confidence than that of attorney and client,' and 'few more anxiously guarded by the law, or governed by sterner principles of morality and justice,'" *McClure* held that unexcused disclosures of confidential information constituted constitutionally deficient performance.[11] *Id*. at 1242-43 (quoting *Damron v. Herzog*, 67 F.3d 211, 214 (9th Cir. 1995)). That holding was based on a straightforward application of *Strickland* and *Nix*, which *McClure* understood to "suggest[] that when 'virtually all . . . sources speak with one voice' as to what

---

[11] *McClure* ultimately concluded that defense counsel's disclosure fell into one of the narrow exceptions to the general duty of confidentiality. *Id*. at 1243.

constitutes reasonable attorney performance, departure from ethical canons and ABA guidelines 'make[s] out a deprivation of the Sixth Amendment right to counsel.'" *Id.* at 1242 (quoting *Nix*, 475 U.S. at 166, 171).

Following *McClure*'s example, we look to California law regarding attorney-client privilege and attorney professional responsibility to guide our analysis as to whether Michaels's attorneys' conduct fell below the minimum acceptable standards of professional conduct and so constituted constitutionally deficient performance.[12] *See id.* In 1989, the year Michaels's first set of attorneys handed the Popik note to the state court and also the year Michaels's second set of attorneys jointly moved with the prosecution to unseal the note, disclosing its contents to the prosecution, California law spoke with "one voice" regarding the attorney-client privilege. *Id.* (quoting *Nix*, 475 U.S. at 165). "Confidential communication between client and lawyer" was defined in California as "information transmitted between a client and his lawyer in the course of that

---

[12] *McClure* also looked to the ABA Model Rules of Professional Conduct because the Oregon Code of Professional Responsibility "echo[ed] both the general principle of confidentiality" defined in the Model Rules, and "particular exceptions" relevant in *McClure*. 323 F.3d at 1242. But California's "ethical prescriptions are those embodied in the state's Rules of Professional Conduct and certain provisions of the Business and Professions Code (e.g., §§ 6068, 6090.5-6107)," and the ABA's Model Rules of Professional Conduct has "no legal force of [its] own." *Gen. Dynamics Corp. v. Superior Ct.*, 7 Cal. 4th 1164, 1190 n.6 (1994) (quotation omitted). We therefore do not consider the ABA Model Rules of Professional Conduct here.

43

relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons." Cal. Evid. Code § 952 (1967). California law protected a client's privilege "to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer." Cal. Evid. Code § 954 (1968). State law also imposed on every attorney the general duty "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." Cal. Bus. & Prof. Code § 6068(e) (1988).

Unlike the relevant ethical guidance in *McClure*, California law at the time provided no exception to the attorney-client privilege or the duty of confidentiality that could justify Michaels's attorneys' disclosure of a damaging and confidential attorney-client communication. *Cf. McClure*, 323 F.3d at 1242. *Michaels I* recognized that the California legislature in 1993 created an exception to the attorney-client privilege "if the lawyer reasonably believes that disclosure of any confidential communication . . . is necessary to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or substantial bodily harm." 28 Cal. 4th at 538 (quoting Cal. Evid. Code § 956.5 (1993)). A similar exception was added in 2003 to the California Business and Professions Code, Cal. Bus. & Prof. Code § 6068(e)(2) (2003), and a rule regarding "Confidential Information of a Client" addressing § 6068(e) was added to the

California Rules of Professional Conduct, Cal. Rules of Prof. Conduct, rule 3-100 (2004). These exceptions and rules would be relevant to assessing an attorney's conduct today, but do not affect what constituted "reasonable attorney performance" in 1989.

As the California Supreme Court correctly held, Michaels's first set of trial counsel breached attorney-client privilege when they disclosed the Popik note, a confidential communication, to the trial court. *See Michaels I*, 28 Cal. 4th at 537-38. The privilege was not waived when Michaels's attorneys disclosed the note to the court, as Michaels never consented to the waiver. Because "it is the client who is the holder of the privilege, the power to waive it is his." 1 *McCormick on Evidence* § 93 (Robert P. Mosteller ed., 8th ed. 2020); *see also* Cal. Evid. Code § 954 (1968).

Michaels's second set of attorneys similarly violated attorney-client privilege by moving jointly with the prosecution to unseal the note, disclosing the Popik note to the prosecution for the first time. As discussed *infra* pp. 54-55, that Grossberg and Chambers's disclosure of the note was apparently inadvertent does not affect our conclusion that the breach of attorney-client confidentiality amounted to constitutionally deficient performance.

Michaels's attorneys' breaches of attorney-client privilege, which together resulted in the disclosure of a damaging confidential communication to the

45

prosecution, were egregious violations of trial counsel's duty of confidentiality under California law, and so a violation of Michaels's right to effective assistance of counsel. Michaels's claim that his attorneys provided constitutionally deficient assistance of counsel as to the Popik note clearly has "some merit," and is therefore a "substantial" claim under the first prong of *Strickland*. *Martinez*, 566 U.S. at 14.

### b. Prejudice

Michaels also demonstrated a substantial claim of prejudice resulting from his trial counsel's deficient performance under *Strickland*, thereby meeting the prejudice requirement as incorporated in the *Martinez* analysis. For a claim to be "substantial" it must have "some merit." 566 U.S. at 14. Although a majority of this panel holds the Popik note was not prejudicial, Michaels's IAC claim nonetheless had "some merit" with regard to *Strickland* prejudice.

The prosecution devoted a significant part of the penalty phase to emphasizing the Popik note as confirmation of its contention that Michaels would remain a danger in prison were he not executed. The Popik note evidence was the entirety of the prosecution's rebuttal *evidence* during the penalty phase and so was the last evidence the jury heard. And the impact of prejudicial evidence "cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record. Some toxins can be deadly in small doses." *Buck v. Davis*, 137 S. Ct. 759, 777 (2017). Michaels's claim that the Popik note uniquely

prejudiced him because it encouraged the jury to infer that he would continue to pose a danger to others while in custody had "some" merit.

In short, Michaels has a "substantial claim" that he was prejudiced by trial counsel's deficient performance under *Martinez*.

## 2. Ineffective Post-Conviction Relief (PCR) Counsel and Cause Under *Martinez*

Having established a substantial claim of prejudice, Michaels must also establish "cause" under *Martinez* by demonstrating that "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland*." 566 U.S. at 14. Again, *Strickland* requires a petitioner to establish that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 688, 694.

### a. Deficient Performance

Michaels's initial PCR attorneys' failure to raise the Popik note IAC claim was unconstitutionally deficient performance. As explained *supra* pp. 42-47, Michaels had a substantial claim that his trial counsel's violation of attorney-client privilege amounted to deficient performance. Michaels's PCR attorneys should have so recognized. In particular, transcripts of pretrial proceedings reveal that Michaels's second set of trial counsel asked the trial court to unseal several

47

documents without knowing that the Popik note was among those documents. PCR counsel should have seen this request as a violation of attorney-client privilege and raised it as a constitutional IAC claim. *Nix* and *United States v. Zolin*, 491 U.S. 554 (1989), among other cases that emphasized the importance of the attorney-client privilege and established that "failure to adhere to reasonable professional standards" could be a "deprivation of the Sixth Amendment right to counsel," were decided approximately a decade before Michaels's counsel filed his first state habeas petition. *Nix*, 475 U.S. at 171. Had PCR counsel performed adequately, they would have recognized trial counsel's conduct amounted to ineffective assistance and raised the IAC claim in the first habeas petition.

Additionally, Michaels's PCR counsel were evidently aware that his trial counsel should not have allowed the Popik note to get into the hands of the prosecution when they filed Michaels's first habeas petition. The same attorneys who represented Michaels in the initial state habeas proceeding had represented him on direct appeal. At the time, California law required petitioners to file their first habeas petitions several months after filing their direct appeal reply brief. *See Walker v. Martin*, 562 U.S. 307, 312 n.1 (2011). On direct appeal, counsel raised the Popik note issue as an evidentiary claim, arguing that the trial court violated the attorney-client privilege. Yet, the same lawyers failed to raise the federal constitutional IAC claim on postconviction review, even though, as we have

48

discussed, *supra* pp. 36-37, California law generally requires IAC claims to be raised for the first time at that stage. *Lopez*, 42 Cal. 4th at 972. There is no conceivable strategic reason why Michaels's counsel did not file the Popik note claim as a federal constitutional IAC claim on state habeas review shortly after filing a related claim on direct appeal. In declarations submitted as part of his second state habeas petition, Michaels's PCR attorneys confirmed that they had simply not spotted the issue. A failure to recognize a potentially viable IAC claim is not a strategic decision.

### b. Prejudice

Having concluded that PCR counsel's conduct was deficient under *Strickland*, we next evaluate whether that deficient conduct prejudiced Michaels. Again, the California Supreme Court, in addition to rejecting the claim as procedurally defaulted, summarily denied Michaels's Popik note IAC claim on the merits. Although that merits decision "is relevant to a determination of whether the failure to raise IAC claims in the first post-conviction petition was prejudicial," it does not preclude us from excusing Michaels's procedural default, as *Apelt* makes clear. 878 F.3d at 827.

In *Apelt*, we evaluated whether a defaulted IAC claim could satisfy *Martinez* even though the state court had rejected the claim on the merits when it was raised in an amended petition for post-conviction relief. *Id*. at 826. *Apelt* recognized that a

state court's "conclusory alternate [merits] ruling" does not "place [petitioner's] constitutional claim beyond even deferential review by a federal court," *if* any procedural default can be overcome through a cause and prejudice inquiry. *Id*. at 827.

At this stage of the inquiry, then, we must evaluate under *Martinez*—and so *not* on deferential review, *see supra* p. 38—whether postconviction counsel performed ineffectively according to *Strickland*, an objective standard. *See Strickland*, 466 U.S. at 694-95. The question is not whether the *particular* PCR court would have rendered a more favorable decision, but whether some reasonable PCR court might have done so. *See Apelt*, 878 F.3d at 827. So we determine for ourselves what a reasonable PCR court could have done had PCR counsel properly raised the Popik note IAC claim.

Whether PCR counsel's ineffectiveness prejudiced Michaels depends in part on the strength of his underlying trial counsel IAC claim, *Djerf*, 931 F.3d at 880, and in part on the use PCR counsel could have made of that claim had it been properly raised in the state habeas petition. As to the first matter, we have held that Michaels's trial counsel IAC claim was "substantial" as an independent claim.[13] *Supra* pp. 41-47. As to the second, whether or not PCR counsel could have

---

[13] Notably, when we reach the merits of this claim, we hold, under AEDPA review, that counsel's performance *was* constitutionally deficient. *Infra* pp. 52-55.

50

demonstrated that trial counsel's ineffective actions leading to the introduction and discussion of the Popik note during the penalty phase was independently likely to have influenced the jury's death penalty verdict is not determinative of the prejudice analysis here. Rather, because there was other, significant constitutional error at the penalty phase—the erroneous admission of the whole of Michael's confession—the failure to raise the trial counsel Popik note IAC claim could be prejudicial as likely to have undermined an otherwise viable cumulative error claim regarding the penalty phase. *See Williams v. Filson*, 908 F.3d at 570.

Again, in Michaels's first habeas petition he argued that the cumulative effect of the constitutional errors made at his trial required reversal of his conviction and sentence. But PCR counsel's failure specifically to raise the Popik note IAC claim kept the state court from considering the potential cumulative prejudice of that note in conjunction with other errors introduced at Michaels's sentencing phase, and so fatally undermined any cumulative error claim.

As Michaels's Popik note IAC claim is substantial, especially considering its potential contribution to cumulative error, *see supra* pp. 41-47, the claim is strong enough to support a conclusion that, had Michaels's PCR counsel performed effectively and raised the claim on initial state habeas review, there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. We

51

therefore hold that there is a reasonable probability the PCR court would have granted Michaels relief had his PCR counsel raised the trial counsel IAC claim.

Michaels thus satisfies the requirements of *Martinez*, and his procedural default is excused. As a result, we may address the merits of Michaels's claim that his counsel was constitutionally deficient, as well as—on the merits—the cumulative effect of counsel's constitutionally deficient performance and Michaels's improperly admitted confession on the sentencing phase of Michaels's trial.

## D. Disclosure of the Popik Note Was Constitutionally Deficient Performance Under AEDPA Review

Because the California Supreme Court denied Michaels's Popik note IAC claim on the merits summarily, Michaels bears the burden of "showing there was no reasonable basis for the state court to deny relief" under *Strickland*'s standard. *Richter*, 562 U.S. at 98. Turning first to the deficient representation prong of *Strickland*, we hold that there was no reasonable basis for the state court to have concluded that Michaels's trial counsel's performance was constitutionally adequate as to the disclosure of the Popik note.

*McClure v. Thompson*, applying AEDPA review, 323 F.3d at 1241, determined that disclosing confidential information without justification in a manner that falls clearly below the minimum acceptable standards of professional conduct constitutes ineffective assistance of counsel under clearly established

52

Supreme Court law, *id.* at 1241-42.[14] As we have explained *supra* pp. 41-46, both sets of Michaels's attorneys violated the attorney-client privilege as incorporated in California state law. There was no plausible exception to the attorney-client privilege or the duty of confidentiality under which Michaels's attorneys might have reasonably been acting in disclosing Michaels's confidential communication. *See supra* pp. 44-45. This case therefore does not present one of the "handful of carefully defined circumstances" in which an attorney's departure from his or her duty of confidentiality does not amount to deficient performance. *McClure*, 323 F.3d at 1242-43.

That the disclosure of the private communication to the prosecution was apparently the result of carelessness as to what was in the sealed record does not affect our conclusion. As a component of the duty of confidentiality, California law required attorneys "at every peril to himself or herself to preserve the secrets[] of his or her client." Cal. Bus. & Prof. Code § 6068(e) (1988). Michaels's attorneys failed to uphold this duty by disclosing Michaels's confidential communication without taking reasonable precautions, let alone "every peril," to protect Michaels's secrets. *Id.*

---

[14] Although not a Supreme Court decision, *McClure* informs what constitutes clearly established federal law for AEDPA purposes. *Supra* p. 20 n.8.

Chambers and Grossberg were appointed after the Popik note was sealed and had no knowledge of the note's contents. When moving jointly with the prosecution to disclose previously sealed documents, Chambers stated to the trial court: "We have a joint request to unseal certain things that were sealed. *We don't know what they were*." There is no doubt that a competent attorney who did not know what was in sealed documents would have investigated the contents of the documents before agreeing to their disclosure. Grossberg and Chambers nonetheless moved jointly with the prosecution to unseal documents, one of which was the Popik note, providing access to both the defense and the prosecution.

The result was that the Popik note—"unquestionably a communication from the client to the attorney [that] falls within the broad [attorney-client] privilege," *Michaels I*, 28 Cal. 4th at 537—was given to the prosecution. Chambers did ask for certain exceptions to disclosure, including Michaels's previous motions to substitute counsel, but he did not ask for an exemption for the Popik note. That decision cannot be attributed to any strategic choice. As the record makes clear, defense counsel's ultimate disclosure of the note to the prosecution was entirely inadvertent.

In sum, defense counsel's disclosure of the Popik note violated one of the core tenets of competent representation, protecting confidential communication. Under clearly established law and prevailing standards of representation at the

54

time, counsel's breach of attorney-client confidentiality amounted to constitutionally deficient performance. It was objectively unreasonable for the California Supreme Court to conclude otherwise, assuming that it did. *See Richter*, 562 U.S. at 102.

## VI. Other Claims[15]

### A. Denial of Substitute Counsel

In Claim Six, Michaels contends that the trial court violated Michaels's Sixth Amendment right to counsel by denying his motion to substitute another attorney for Grossberg after an irreconcilable conflict developed between Michaels and Grossberg.

---

[15] Michaels raised four additional claims that pertain only to the penalty phase. In Claim Five, Michaels contended that the government committed prosecutorial misconduct by making several assertedly improper remarks during its closing arguments in the penalty phase. In Claim Ten, Michaels argues generally that the Sixth Amendment guarantees the right to effective assistance of advisory counsel. Claims Eleven and Twelve assert specific IAC claims against Chambers after he was appointed advisory counsel. Claim Twelve faults Chambers for his alleged failure adequately to investigate and present certain mitigating evidence at the penalty phase. And although Michaels asserts that Claim Eleven—alleging Chambers was ineffective for failing to present the testimony of Christina's father—"requir[es] reversal of his convictions and at least his death sentence," Christina's father's testimony would have supported the defense's theory for Michaels's motive for killing Clemons, but not his innocence.

The majority addresses these claims in the accompanying opinion; Judge Berzon would not reach these additional bases for habeas relief regarding the penalty phase, as she concludes the cumulative prejudice of Michaels's confession and the Popik note substantially affected the outcome of that phase.

The court initially appointed James Burns as lead counsel and Charles Duff as co-counsel. Shortly after Duff was appointed, the trial court granted his request to be relieved for personal reasons, replacing him with Mark Chambers. Michaels then began having difficulties with attorney Burns. That deteriorating relationship resulted in Burns asking to be relieved, a request the trial court granted.

The trial court then chose Richard Grossberg as new lead counsel, replacing Burns. Soon after Grossberg's arrival, Michaels became discontented with his representation. Michaels submitted a letter to the court complaining, among other things, that it had taken Grossberg "three months to even get the courts to finance him to work my case, which has caused my case's defense three months of 'dead time.' . . . [T]hus, none of the specialists, investigators, etc. have even started working my case's defence [sic], nor have the many other aspects, which all require financing, begun to get started."

One month after submitting that letter, Michaels moved to remove Grossberg as lead counsel under *People v. Marsden*, 465 P.2d 44 (Cal. 1970), a request the trial court denied. The court concluded that any difficulties in representation were caused by Michaels's unwillingness to cooperate and that Michaels did not show that he was receiving inadequate assistance from Grossberg.

Grossberg also moved to be relieved as counsel, stating that "[Michaels] can't have a fair trial as long as I'm his lawyer." Grossberg represented that his preparation for trial had up until that point been only "ministerial" and "clerical." And he reported that he had not had a single "meaningful conference [with Michaels] insofar as the facts of the case are concerned." Chambers confirmed to the trial court that despite good-faith attempts to improve the relationship, there was an "irreconcilable conflict between Mr. Grossberg and Mr. Michaels." He explained that there were two primary points of conflict: First, Michaels objected to Grossberg's proposed defense strategy, which was to represent that Michaels was in Clemons's apartment but never entered the bedroom where she was killed. Second, Michaels objected to the investigator Grossberg hired; the investigator assertedly conducted only a single interview with Christina and tried to contact only one other witness (who refused to speak to the investigator).

The trial court denied Grossberg's motion. On February 5, 1990, Grossberg renewed his motion to be relieved, but it was again denied.

In the last reasoned state court opinion addressing this claim, the California Supreme Court rejected it on the grounds that (1) Michaels had failed to show how the conflict between him and Grossberg resulted in constitutionally inadequate assistance of counsel; and (2) Michaels had not shown that the conflict was irreconcilable, as Michaels had caused the breakdown in the relationship and

57

refused to work to improve it. *Michaels I*, 28 Cal. 4th at 523. This holding was neither an unreasonable application of clearly established Supreme Court law nor an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

The Sixth Amendment guarantees defendants in criminal cases the right to adequate representation. *See Strickland*, 466 U.S. at 686. By extension, a defendant is also entitled to substitute counsel if an "irreconcilable conflict" between a defendant and his counsel prevents counsel from rendering effective assistance. *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).

Boundaries surround this principle. The Sixth Amendment does not guarantee the right to appointment of a particular attorney, *see Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989), or the right to a "meaningful relationship" with that attorney. *Morris v. Slappy*, 461 U.S. 1, 14 (1983). These bounding principles mean that a defendant is not entitled to substitute counsel because of a conflict of his "own making," *Schell*, 218 F.3d at 1026, or because he refuses to cooperate with counsel "because of dislike or distrust" of counsel, *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc). Otherwise, a defendant could effectively overturn the appointment of any attorney by refusing to cooperate with that attorney, intentionally delaying proceedings until he was appointed his attorney of choice. So the dispositive question when a defendant complains of a conflict with his attorney but the conflict is of his own making is

the same as in IAC cases: Did counsel provide constitutionally adequate counsel according to the standards established in *Strickland*? *See Plumlee*, 512 F.3d at 1211.

Here, the California Supreme Court reasonably concluded that the conflict between Michaels and his attorney was the result of Michaels's subjective distrust of Grossberg, and that Michaels's actions triggered the breakdown of his relationship with Grossberg. *Michaels I*, 28 Cal. 4th at 523. Michaels stated in his motion to substitute counsel that "Grossberg has proven himself to be unreliable, untrustworthy, and someone whom I cannot place any confidence in," and that he had as a result asked Grossberg not to contact him or anyone else related to the case. Thereafter, Grossberg attempted to communicate with Michaels on several occasions without success.

According to Chambers's account, much of Michaels's distrust of Grossberg resulted from disagreements about trial tactics. Such disagreements do not constitute a basis for an unconstitutionally irreconcilable conflict. "[A] lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval." *Schell*, 218 F.3d at 1026 n.8 (quoting *Brookhart v. Janis*, 384 U.S. 1, 8 (1966) (alteration in original)); *see also Florida v. Nixon*, 543 U.S. 175, 187 (2004).

59

The state court's other conclusion—that Grossberg rendered constitutionally adequate assistance as it relates to the attorney-client conflict claim—was also reasonable. Contrary to Michaels's assertions, the record reveals that Grossberg took numerous steps to prepare for trial. Grossberg attended the trial of Michaels's codefendant Darren Popik, hired a psychologist and investigator, and interviewed several witnesses. Billing records detail the investigator's efforts to contact and interview several other witnesses as well as to interview Michaels. The "[t]imesheets indicate that [Defendant's] trial counsel investigated mitigating evidence."[16] *Pinholster*, 563 U.S. at 192. On the substitution of counsel claim, Michaels cannot overcome our "doubly" deferential review of his IAC claim under AEDPA. *Richter*, 562 U.S. at 105. We deny Michaels's habeas petition with respect to his sixth claim for relief.

## B. Ineffective Assistance of Counsel for Advising Michaels to Proceed Pro Se

In Claim Seven, Michaels takes issue with his other attorney, Chambers, arguing that he provided ineffective assistance of counsel when he advised Michaels to represent himself after the trial court refused to relieve Grossberg.

---

[16] Although Grossberg himself warned the trial court that his continued representation of Michaels would prevent Michaels from receiving a fair trial, that warning is not dispositive. The *Strickland* deficient performance inquiry, here applicable because Michaels caused the relationship breakdown, is an objective one. *See* 466 U.S. at 688.

After the trial court denied the several motions to relieve Grossberg, it allowed Chambers to become lead counsel, with Grossberg as the secondary attorney. Chambers then advised Michaels to seek to represent himself pursuant to *Faretta v. California*, 422 U.S. 806, 834 (1975), and he did so.[17] After an extensive hearing, the trial court granted the *Faretta* motion. The court found that Michaels was competent and that his waiver of the right to counsel was knowing, intelligent, and voluntary. The trial court then appointed both Grossberg and Chambers as advisory counsel.

As it turned out, during both the guilt and penalty phases, Chambers conducted the trial proceedings. Given that circumstance, we agree with the district court that, whether or not Chambers provided constitutionally inadequate advice regarding the *Faretta* motion, Michaels has not shown that he was prejudiced by any such advice. Before Michaels moved to proceed pro se, he had refused to

---

[17] The government argues that the record does not show that Chambers actually advised Michaels to proceed pro se. The California Supreme Court "evaluates a petition 'by asking whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief. If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [order to show cause].'" *In re Figueroa*, 4 Cal. 5th 576, 587 (2018) (alteration in original) (citation omitted) (quoting *People v. Duvall*, 9 Cal. 4th 464, 474-75 (1995) (en banc)). Because the state court denied Michaels's argument on the merits in a summary order, it necessarily assumed the truth of his factual allegations. We therefore also assume that Chambers advised Michaels to proceed pro se.

cooperate with Grossberg, and the trial court had allowed Chambers to become lead counsel. Although Michaels later officially proceeded pro se, he acknowledges that Chambers "conducted the *entirety* of the pretrial, trial, and penalty proceedings," while Grossberg remained sidelined. Nothing in the record suggests that if he had remained formally appointed, Chambers would have conducted proceedings any differently than he did as advisory counsel.[18]

Michaels makes no real attempt to show that the result would have been more favorable to him had Chambers and Grossberg remained as appointed, rather than advisory, counsel. Instead, he tries to circumvent his burden to prove prejudice in two ways.

First, he argues that because Chambers's advice tainted the *Faretta* decision, there was structural error not subject to traditional *Strickland* prejudice analysis. But in *Harding v. Lewis*, 834 F.2d 853 (9th Cir. 1987), we rejected a similar structural error argument, holding that "[i]n [that] case, it [was] not unduly burdensome for us to assess the effect of . . . advice [to proceed pro se] on the outcome of [the defendant's] trial." *Id*. at 859. Here, as the advice had *no* practical impact, as it turned out, on the conduct of the trial, the outcome of the trial could not possibly have been different had Chambers been officially designated as

---

[18] The majority's conclusion that Michaels was not prejudiced by the advice to proceed pro se relies on its conclusion that Chambers, acting as nominally advisory counsel, did not render ineffective assistance. Majority Op. at 24-45.

counsel rather than as standby counsel. Under these circumstances, we follow *Harding* and decline to presume prejudice.

Second, Michaels claims that the proper prejudice inquiry is whether he would have proceeded pro se without Chambers's advice, not whether the trial would have proceeded differently had he not proceeded pro se. Citing *Lafler v. Cooper*, 566 U.S. 156 (2012), Michaels analogizes to IAC claims in the plea-bargaining context, contending that the inquiry in that context is simply "whether the result of the pretrial proceeding would have been different."

Michaels misreads *Cooper*. That case held that to show prejudice from an attorney's deficient advice to reject a plea offer, a defendant must establish more than that he would have accepted the plea deal. He also must show that "there is a reasonable probability that the plea offer would have been presented to the court . . . , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been *less severe* than under the judgment and sentence that in fact were imposed." 566 U.S. at 164 (emphasis added).

Thus, accepting the analogy, Michaels cannot simply show that he would not have proceeded pro se without Chambers's advice. He must also show that keeping Chambers as appointed counsel would have led to a more favorable result. He cannot do so, as Chambers fully represented Michaels at trial despite Michaels's

formal pro se status. We therefore reject Michaels's claim that Chambers rendered ineffective assistance by advising him to proceed pro se.[19]

## C. Trial Court's Failure to Inquire into Michaels's Competency, and Counsel's Failure to Raise Competency

In Claim Nine, Michaels contended that (1) the trial court erred in not conducting a *sua sponte* competency hearing and (2) his attorneys were constitutionally ineffective in failing to raise the competency issue.

Michaels lists a number of facts which he alleges suggests he was incompetent: he (1) was under heavy medication at the time of trial; (2) had gone on a hunger strike while in custody; (3) initially pleaded not guilty by reason of insanity; (4) had previously burned some of his flesh to the bone; (5) had an "other-than-honorable" discharge from the Marines for psychiatric reasons; (6) had a history of childhood physical and sexual trauma; (7) was in need of psychotherapy; and (8) had spent significant portions of his pretrial custody in isolation and been twice taken to the jail's medical facility on the verge of committing suicide. Most of these facts are contained in two psychological reports ordered by the trial court in March 1989, a year before the trial. Both reports

---

[19] In Claim Eight, Michaels argued that his waiver of counsel was invalid because (1) the trial court failed to inquire sufficiently into his medication usage at his waiver hearing and (2) Michaels moved to waive counsel only because the trial court would not replace Grossberg. This claim fails for the same reason as Claim Seven—as a functional matter, Michaels was represented by counsel at the guilt and penalty phases.

ultimately concluded that Michaels, although suffering from mental illness, exhibited normal levels of intelligence and was fully aware of the nature of his actions. In his state habeas petition, Michaels presented additional facts showing that he had repeated contacts with the psychiatric unit while in custody; had been prescribed several psychotropic drugs; hoarded these drugs; was suspected of multiple suicide attempts; and, according to an expert evaluation, had longstanding brain damage.

The California Supreme Court summarily rejected Michaels's incompetency claims on the merits. We conclude that habeas relief on these incompetency claims is not warranted. "[T]he criminal trial of an incompetent defendant violates due process." *Medina v. California*, 505 U.S. 437, 453 (1992). To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational and factual understanding of the proceedings against him." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (alterations in original) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)). The same standard applies when evaluating competency to waive counsel.[20] *See Godinez v. Moran*, 509 U.S. 389, 398 (1993).

---

[20] Michaels's reliance on *Indiana v. Edwards*, 554 U.S. 164 (2008), to argue that the standard for competency to proceed to trial is not the same as the competency standard for self-representation, is unavailing. *Edwards* held that a *state* may insist upon representation for a defendant who is competent to stand trial

*Pate v. Robinson*, 383 U.S. 375 (1966), held that, where serious questions about a defendant's competency to stand trial have been raised or are evident, a trial court's failure to conduct further inquiry violates due process. *Id.* at 385. "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient." *Drope v. Missouri*, 420 U.S. 162, 180 (1975). In determining whether the failure to conduct an inquiry rises to a constitutional violation, the panel "may consider only the evidence that was before the trial judge."[21] *McMurtrey v. Ryan*, 539 F.3d 1112, 1119 (9th Cir. 2008).

Here, the California Supreme Court rejected Michaels's competency claim on the merits, necessarily concluding that the evidence before the trial court was insufficient to require a *sua sponte* competency hearing. That conclusion was not unreasonable under § 2254(d) of AEDPA.

As the district court concluded, many of the competency-related facts flagged by Michaels—such as his initial plea of not guilty by reason of insanity or

---

but nonetheless suffers serious mental deficiencies. *Id.* at 178. It expressly did not address whether states are *required* to provide representation to such individuals. *See id.*

[21] The evidence Michaels produced for his state habeas petition, is thus not pertinent to this claim. It is, however, relevant for his competency-related IAC claim, discussed below.

his complaints about jail personnel—do not suggest incompetency to stand trial. Likewise, the psychological reports ultimately indicated that Michaels, although troubled, was "able to consult with his lawyer with a reasonable degree of rational understanding" and maintained a "rational" and "factual understanding of the proceedings against him." *McMurtrey*, 539 F.3d at 1119. And although this court has recognized that the use of psychotropic medication is one factor to be considered in evaluating competency to stand trial, *see, e.g., id.*, the defendants in those cases exhibited other substantial symptoms of incompetence, such as erratic and irrational behavior during trial.

Deciding whether further inquiry into a defendant's competence is needed requires hard judgment calls. "There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180. Under AEDPA, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. Given the generality and flexibility of the competency inquiry and the deference owed under AEDPA, the record does not establish that the California

67

Supreme Court's rejection of Michaels's inquiry into incompetency to stand trial claim was unreasonable.

For similar reasons, Michaels's counsel were not ineffective because they did not raise the competency issue. The additional evidence submitted with Michaels's first state habeas petition is cognizable as to the IAC competency claim, *see, e.g.*, *Cunningham v. Wong*, 704 F.3d 1143, 1161 (9th Cir. 2013), but does not affect our conclusion. The two doctors retained as consultants to evaluate Michaels submitted declarations in support of Michaels's federal habeas petition, but those declarations did not discuss his competency to stand trial. And Michaels's so-called "suicide attempt" was, according to Michaels himself, motivated by his desire to speak to an attorney, not by genuine suicidal ideation. The California Supreme Court's rejection of Michaels's IAC competency claim was not unreasonable.

**D. Denial of Request for an Additional Six-Month Continuance of Trial**

In Claim Thirteen, Michaels argued that the trial court's denial of his request for a continuance before trial on March 26, 1990, violated his due process rights.

The trial court agreed in February 1990 to continue Michaels's trial until April after granting his self-representation request. In the interim, the prosecution notified Michaels that it intended to introduce certain evidence not mentioned previously at the penalty phase—namely, the Popik note discussed above and other

instances of Michaels threatening violence against Popik, and being violent toward Cristina Clemons. On March 26, Michaels requested a further six-month continuance, maintaining that he had not been provided with access to a "pro per cell" with law books and writing implements until February 23, that his former investigator had inadequately prepared the case, and that he had not received funding for further investigation until March 13.

The trial court denied the request, noting that Michaels had the benefit of numerous motions filed by Grossberg that Michaels "may choose to adopt"; that he was placed in a "pro per cell" sixty days before trial; and that he would have at least ninety days before opening statements to prepare, given the likely length of jury voir dire. The trial court also emphasized that it had already granted multiple continuances. On direct appeal, the California Supreme Court rejected Michaels's claim that the denial of a continuance was improper, noting that Michaels "had funding, an active investigator, and advisory counsel who was familiar with the case" and that, "although much remained to be done, [Michaels] had 60 days" to prepare for trial. *Michaels I*, 28 Cal. 4th at 525.

The denial of a request for a continuance may, under unusual circumstances, result in a denial of due process. *See Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). But "[t]he matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process

even if the party fails to offer evidence or is compelled to defend without counsel." *Id.*; *see also Morris*, 461 U.S. at 11. For that reason, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar*, 376 U.S. at 589.

On appeal, Michaels focuses on the California Supreme Court's failure in its opinion to discuss the prosecution's notices of intent to introduce additional evidence in aggravation. Nothing in the record suggests that either the trial court or the California Supreme Court failed to consider those notices. Michaels specifically raised these notices in his request for a continuance, and the prosecutor argued at the hearing that the additional evidence raised in those notices would only require Michaels to investigate two additional witnesses. Nothing in the trial court's decision suggests that it failed to consider on the continuance motion the arguments before it concerning additional evidence.

Likewise, when the California Supreme Court evaluated the issue, it determined that there was sufficient time for Michaels to prepare for trial notwithstanding the fact that "much remained to be done." *Michaels I*, 28 Cal. 4th at 525. The legal standard for determining whether a continuance violates due process affords substantial discretion to a trial court. *See Ungar*, 376 U.S. at 589.

Given that broad standard, as well as the deference owed under AEDPA, the circumstances here do not render the California Supreme Court's decision that the denial of the continuance was not a due process violation unreasonable. *See Yarborough*, 541 U.S. at 664.

## VI. Conclusion

We AFFIRM the district court's judgment denying a writ of habeas corpus with respect to the guilt phase. With respect to the penalty phase, the majority finds no cumulative or other prejudice, and affirms the denial of the petition, for reasons stated in its separate opinion; Judge Berzon dissents from that holding for the reasons stated in her dissent.

*Michaels v. Davis,*
No. 15-99005

**Bea, Circuit Judge:**

This majority opinion addresses Michaels's three remaining claims: (1) whether the admission of Michaels's confession and the Popik note prejudiced the penalty phase of the trial, (2) whether the prosecutor committed misconduct during the penalty-phase closing arguments, and (3) whether Michaels is entitled to relief for ineffective assistance of advisory counsel. We answer each of these questions in the negative and affirm the district court's denial of habeas relief on all claims.

## I.     Penalty-Phase Prejudice

Michaels argues that he is entitled to habeas relief because the introduction of his confession and the Popik note during the penalty phase of the trial prejudiced him by causing the jury to render a death verdict they otherwise would not have in the absence of this unconstitutional evidence.

Constitutional error does not entitle Michaels to habeas relief if an error was harmless. In habeas proceedings, we apply the actual prejudice standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under *Brecht*, habeas relief is available only if the constitutional error had a "'substantial and injurious effect or influence'" on the verdict. *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

1

"When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had a substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). "By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435. Furthermore, these constitutional errors are not viewed in isolation. Indeed, "the cumulative effect of multiple errors may prejudice a defendant even if no single error in isolation is sufficient to establish prejudice." *Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018).

So far, the panel agrees that the introduction of Michaels's confession during the *penalty* phase of the trial infringed his right to silence, and that Chambers's failure to object to the introduction in evidence of the Popik note was deficient performance by Chambers under *Strickland*, based on clearly established federal law. The panel also agrees that the introduction of the confession during the *guilt* phase of the trial did not prejudice Michaels because the prosecution presented overwhelming and admissible evidence of guilt. The majority and the dissent part ways on the sole question whether these constitutional errors prejudiced Michaels during the penalty phase of the trial. Ultimately, because the confession and the Popik note were cumulative of admissible evidence demonstrating the brutality of

2

the crime, Michaels's penchant for future dangerousness, and the motive for the murder, we are not in "grave doubt" that the error had a "substantial and injurious effect" on the trial and therefore affirm the district court's denial of habeas relief for lack of prejudice. *O'Neal*, 513 U.S. at 436.

## A.    Standard of Review

Because the California Supreme Court held there was no *Miranda* violation as to the introduction in evidence of Michaels's recorded confession, it made no determination as to whether any such error was harmless during the penalty phase, and we review this element of Michaels's claim de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam). Similarly, because the California Supreme Court did not hold that a *Miranda* violation occurred, it never ruled on whether Michaels's confession and the Popik note had cumulative prejudicial effect and we review this issue de novo as well. *Id.*

## B.    The Confession

As discussed in the per curiam opinion, ordinarily, a defendant's own confession is "the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (citation omitted), and an erroneously admitted confession "will seldom be harmless," *United States v. Williams*, 435 F.3d 1148, 1162 (9th Cir. 2006). But, just as we concluded above, seldom does not mean never, and the limited use of the confession, along with the

3

sheer volume of aggravating evidence properly admitted against Michaels during the penalty phase of the trial, rendered the admission of his confession harmless.

We note at the outset that the prosecution relied on the confession infrequently during its closing argument. Indeed, the prosecutor detailed Michaels's criminal history for nearly eleven pages of his forty-page closing argument before mentioning the confession evidence at all, which evinces its diminished importance. Indeed, this criminal history was a particularly important aggravating factor, on which the jury heard substantial evidence during the penalty phase which the prosecutor summarized as follows during his closing argument:

> 1981, he had a gun in his sock. He went into Joseph Toy's house, stole a gun. He was armed and dangerous. Long Beach, 1981. That's one. Texas, two knives, one in each boot, 1987. Another factor in aggravation. Texas, beating on Christina Clemons who was drunk . . . . That's a factor in aggravation. Oceanside, January the 23rd, two knives, two blades under his jacket for protection. That's a factor in aggravation. Oceanside, 1988, August the 30th, putting a gun to Chad Fuller's head. That's aggravation. That's a reason for the death penalty. Oceanside, the next night, having a revolver hidden in the small of his back. That's aggravation. Oceanside, September the 11th, 1988, robbing Chad Fuller, another act of violence. That's aggravation.

This evidence of Michaels's criminal past was entirely independent from the confession evidence, but something upon which the jury was perfectly able to and likely did rely, given the length of time the prosecutor discussed it during the closing argument. The dissent argues that evidence of Michaels's violent past does not convincingly render the confession nonprejudicial because we have found prejudice

4

in cases with even more extreme aggravating factors. But each case the dissent cites for this proposition is distinguishable from this case. In *Wharton v. Chappell*, 765 F.3d 953, 978-79 (9th Cir. 2014), where the defendant brutally murdered his girlfriend and had prior felony convictions for rape and murder, we held that it was the failure to introduce *unique mitigating* evidence that resulted in prejudice, not, as here, the introduction of *cumulative aggravating* evidence of the defendant's capacity for violence. In *Hovey v. Ayers*, 458 F.3d 892, 930 (9th Cir. 2003), where the defendant kidnapped and murdered a young girl, we found that prejudice resulted from the defendant's ineffective assistance of counsel in failing to turn over *mitigating evidence* to the defense expert during the sentencing phase because (1) the defendant had no history of serious violent crimes, and (2) the jury asked several questions of the court during deliberations about the death penalty. In *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003), we held, similarly to *Wharton*, that it was the failure to introduce *mitigating evidence* that resulted in prejudice, not the introduction of cumulative evidence in aggravation.

Even were we to accept the proposition that Michaels's history of violence is not as extreme as what we saw in the *Wharton* and *Douglas* cases, missing mitigation evidence is far likelier to have an impact on a penalty-phase jury than evidence of the defendant's criminality that the jury has already heard repeatedly from admissible sources. This cumulative evidence point is key; *Brecht*, which established

5

the harmless-error review standard we apply in these cases, held that the defendant suffered no prejudice from the prosecutor's repeated reference to his post-*Miranda* silence because that evidence was "in effect, cumulative" of admissible evidence of pre-*Miranda* silence. 507 U.S. at 639. We see the same pattern of cumulative evidence in Michaels's case.

The dissent argues that the confession prejudiced Michaels because it was uniquely able to describe the murder and Michaels's role in it in shocking and graphic detail. But the jury heard extensive other evidence on this point. Defense expert witness Dr. Hubbard testified that Michaels told him that "he cut [the victim's] throat and [the] knife broke," after which Popik got another knife from the kitchen and Michaels "cut her throat some more." An acquaintance of Michaels, Rodney Hatch, testified that, shortly after the murder, Michaels admitted to him that he had slit a woman's throat. *People v. Michaels*, 28 Cal. 4th 486, 502 (Cal. 2002). Two other people present with Hatch, Kimberly Buckhalter and Dennis Lucas, testified that Michaels used a gesture to suggest that he had killed a woman by cutting her throat. *Id.* The jury also heard evidence that Michaels told people ahead of time that he planned to cut the victim's throat. The prosecutor emphasized that Michaels's "lying in wait" was an aggravating factor, but the jury did not have to rely on the confession evidence to make this point. Dr. Hubbard also testified that Michaels said he had to "kill [] time" before the murder because when he first visited

6

the victim's apartment in the early evening, she was at work, so he returned later at midnight.

The dissent also asserts that Michaels's demeanor and laughter during the confession, which the jury was able to observe by watching the video of his police interrogation, demonstrated his lack of remorse. But, to whatever extent this is true, the prosecution also presented to the jury other admissible and direct evidence of Michaels's lack of remorse. The jury heard the testimony of Cheryl Goldenberg, Michaels's sister. Six months after the murder, she received a letter from Michaels while he was in prison, stating that he will "never have any regret" for what he did to the victim. Eighteen months after the murder, Michaels told Dr. Hubbard that he felt no remorse. Michaels also told Dr. Hubbard that, if he could do the murder over again, he would do a "head and heart murder," which means to shoot the victim in the head and chest, because that would have been "cleaner, better." Dr. Hubbard testified that this statement illustrated a lack of remorse. And remember, Dr. Hubbard was the *defendant's* psychiatric expert witness.

Experts from both sides testified that Michaels was a psychopath. Dr. Hubbard told the jury that "looking at [Michaels] superficially, one would see a psychopath or sociopath." Two prosecution experts, Dr. Murphy and Dr. Rappaport, diagnosed Michaels as having an antisocial personality disorder, and Dr. Murphy's report noted that Michaels behaved in a psychopathic fashion. Both Dr. Hubbard and Dr. Murphy

7

agreed that, in general, Michaels was a person who showed no remorse for his crimes.

In addition to the extensive evidence of Michaels's lack of remorse, the jury also heard overwhelming evidence from both the defense and prosecution experts, as well as lay witnesses, that Michaels took pleasure in having a reputation as a killer. Dr. Hubbard testified that Michaels was a "habitual liar" who "bragged" about "his power, his destructiveness and about his evil." Dr. Hubbard stated that Michaels had a "clear-cut pattern" of emphasizing "what a bad guy he is to make him appear better or more powerful in the eyes of others and feel better about himself." Dr. Hubbard agreed with the prosecutor's characterization of Michaels as "a man who feels good about himself when he is committing violent and asocial acts." Dennis Lucas testified that, after the murder, he saw Michaels's "hit list," and that Michaels told him that there were other "jobs to be done and money involved." *Michaels*, 28 Cal. 4th at 506. The record overwhelmingly shows that Michaels proudly cultivated his reputation as a killer, even without the confession evidence.

The confession was redundant evidence for each point the prosecutor used it to prove—Michaels's great love of violence, his graphic descriptions of his participation in the murder, and his lack of remorse. And although the defense did offer some mitigating evidence, we disagree with the dissent's conclusion that the

8

presence of such evidence made this case so close that the exclusion of the confession would have tipped the scales in Michaels's favor.

The dissent argues that the jury could have concluded that Michaels's motive for the crime was to protect Christina from Clemons's physical and sexual abuse, and that this was a potential mitigating circumstance. But the jury also heard evidence that Michaels was not Christina's protector, but another abuser. Christina herself testified that Michaels was physically violent with her in the past and that she was afraid of him.

The jury also heard ample evidence supporting a financial motive for the murder. Dr. Hubbard testified that Christina used her mother's life insurance policy as a "tool of manipulation" to persuade Michaels to commit the murder, showing that it was the money, and not protecting Christina, that was his true motivation. Before the murder, Michaels told his co-defendant, Popik, that the victim had insurance coverage of $100,000 and that the proceeds would help Michaels and Christina start a new life. *Michaels*, 28 Cal. 4th at 503, 519. Goldenberg testified that, eight months before the murder, Michaels called her asking for money. The jury heard that Michaels wrote a letter before the murder that said he would do "whatever his morals allowed" to provide financial backing for himself and Christina.

9

On the evening of September 29, just three days before the murder, Michaels asked his roommate Mark Hebert if he wanted to go to Escondido to do a "tax," which Hebert explained meant collecting a debt. On the night of the murder, Michaels told his roommate Veldina Davis that he was going to Escondido to do a "tax." Davis also testified that Michaels made a statement about knocking off Christina's old lady, and that Christina replied, "then we can get the money." *Michaels*, 28 Cal. 4th at 519.

In fact, the interrogation, which the dissent claims was prejudicial, actually supported the defense's theory of the case and helped *rebut* the theory that Michaels killed Clemons for the money; Michaels told interrogators that he killed Clemons "so Chris[tina] would not have to go back with her mother." When talking about Christina's relationship with her mother during the interrogation, Michaels told the officers:

> Her mother's manic-depressive, and the beatings, abuse, and all sorts of bad things, just like in my past. That's why I don't care to know where my family is, most of them. Just a matter of destroyed that little girl. And there was no way I was going to let it happen again. It's gone too fucking far.

The dissent also points to mitigation evidence of Michaels's difficult childhood and the abuse that he, his sister, and his mother suffered at the hands of his father. But the prosecutor skillfully rebutted this point during his closing argument:

The defense seems to be well, Mr. Michaels had a rough childhood, so it's okay that he did what he did. He needed to feel like a big man, so it's okay. It made him feel better to do this. Well, lots of us have had tough childhoods. None of us are the brutal murderers that Mr. Michaels is. Mr. Michaels's sister, Cher Goldenberg, apparently had a tough childhood, too, and she turned out okay. She is a very respectable young woman. She is hard working, she is law abiding, she is a young business woman, she is not a murderer. Similarly, Mr. Michaels's mother; she is working, she cares for her family, she is a loving and attentive murder—mother. She is not a murderer, either.

There is not a single aggravating factor that the jury could have gleaned from Michaels's confession evidence that was not otherwise proved by ample admissible evidence, nor any piece of mitigation evidence that was rebutted by the confession that would otherwise have gone unrebutted. Indeed, the confession evidence helped support the defense's own theory that Michaels killed Clemons to protect Christina. We hold that Michaels was not prejudiced by the admission of the confession.

## C. The Popik Note

We begin our analysis of the cumulative effect of the Popik note on the penalty phase from a similar place, and point out that the prosecutor relied on the Popik note to an even lesser extent than he did the confession evidence, citing it only twice during his entire forty-page closing argument.

The dissent argues that the Popik note is prejudicial because it was not cumulative of evidence of Michaels's *past* dangerousness, but rather unique evidence of Michaels's potential for *future* dangerousness. But, as discussed above,

11

the jury heard extensive evidence of Michaels's potential for future dangerousness, including evidence that he had a "hit list" of future murders he wanted to commit for money and his great love of violence generally. Dr. Murphy's report also quoted Michaels, while discussing the murder, as saying "I'd do it again but I'd do it differently next time. It just didn't work out the way it should have. Otherwise, it would have been an H & H Killing . . . (H & H refers to heart and head). Same thing applies to my father. If I ever find him I'll do an H & H killing on him." Michaels's own account of his future murderous intent never wavered, and the jury could certainly have relied on evidence other than the Popik note to decide that the death penalty was proper.

Given the limited use of the Popik note and its minimal evidentiary value at trial, we cannot conclude that it had a prejudicial effect on the jury, even in combination with the confession evidence. Accordingly, we reject Michaels's claim of cumulative error as to the admission of his confession and the Popik note.

## II. Prosecutorial Misconduct

In Claim Five, Michaels contends that the prosecutor committed four species of misconduct during the penalty-phase closing arguments: (1) accusing Michaels of participating in devil-worship in violation of *Dawson v. Delaware*, 503 U.S. 159 (1992), (2) making an improper "thirteenth juror" argument that Michaels himself would have voted for the death penalty had he served as a juror in his own trial, in

12

violation of *Payne v. Tennessee*, 501 U.S. 808 (1991), (3) claiming that Michaels was a contract killer, and (4) using improper name-calling and emotional appeals in violation of *Darden v. Wainwright*, 477 U.S. 168 (1986). For the reasons discussed below, we affirm the district court's denial of habeas relief on all claims of prosecutorial misconduct.

## A. Background

During the penalty phase of the trial, the jury heard mitigation evidence that Michaels was a member of a Presbyterian church. In response, the prosecutor introduced documents found in Michaels's tackle box, and referenced those documents during closing arguments to accuse Michaels of participating in devil-worship:

> We also know that Mr. Michaels was a member of a Presbyterian church in Big Springs, Texas. And you may consider that to be a factor in mitigation. We also know from his tackle box and what appears to be that pentagram and the six six six that Mr. Michaels had interests in other types of religion, which I think we call devil worship, and three sixes is a sign of the beast, and that is Mr. Michaels; he is a beast.

The prosecutor went on to recount the testimony of Michael Brohammer, one of Michaels's childhood friends, and argued to the jury that if Michaels was a juror in his own case, he would vote for the death penalty:

> I like to think of Mr. Michaels as the 13th juror in this case because if Mr. Michaels were voting on this case, he would vote for the death penalty; there is no doubt about it. He believes in the death penalty. He told Michael Brohammer when they were

13

kids that "if somebody commits a heinous crime and if they deserve it and if that is what is to be found the punishment, there should be no problem with that. . . . Mr. Michaels would vote for the death penalty. He would say "that guy is scary;" he would say "that guy is twisted, he is a psychopath, he has ruined a lot of lives, he is dangerous, he is dangerous with a knife, with a gun, with a pipe bomb he is a would-be mass murderer. How can we allow anyone to live whose goal is to kill people? We can't take that chance." That would be Kurt Michaels on Kurt Michaels, the 13th juror.

The prosecutor also argued that Michaels was a contract killer, stating "[t]he defense may try to put Christina Clemons back on trial and blame it all on her. But ask yourselves why did Christina Clemons pick Kurt Michaels to do this murder. Because he was a professional. Because he had a great love for violence." Borrowing from the writings found in Michaels's tackle box, the prosecutor continued:

> Mr. Michaels is the lone dark wolf. He's an executioner, he's a justice bringer, he's a contract killer. He wants to kill a lot of people, he's a shotgun man. He's a gun runner, he's into pipe bombs. He hires people to work as his assistants, he is a psychopath, he brags, he bosses, he robs, he cuts, he abuses, he bullies, he murders, and he feels good about it.

Throughout his closing argument, the prosecutor variously described Michaels as a "monster," a "psychopath," a "beast," and "evil." After showing the jury a portion of Michaels's taped confession, the prosecutor argued, "[t]his is a man who expects mercy, this is a man who showed no mercy to anybody." The prosecutor described how the victim must have felt upon waking up to intruders in her home: "A primal fear we all have, the idea of waking up and having somebody in our

14

bedroom who might hurt us, a stranger. Only it's two men; one of them is a stranger, Popik. The other is a beast, Michaels."

Michaels did not object to or move to strike the devil-worship accusations, "thirteenth juror" argument, contract-killer rhetoric, or name-calling and emotional appeals at trial. On direct appeal, Michaels argued that the prosecutor committed misconduct by calling Michaels a "beast" and accusing him of devil worship, but the California Supreme Court declined to rule on those issues because they were waived for lack of objection at trial. *Michaels*, 28 Cal. 4th at 540. Michaels did not argue prosecutorial misconduct in his first habeas petition. The California Supreme Court rejected the prosecutorial misconduct claim in Michaels's second habeas petition summarily on the merits and as procedurally barred. The district court acknowledged that the California Supreme Court held that the prosecutorial misconduct claim was procedurally defaulted but denied habeas relief on the merits. We take the same approach here. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.").

**B.     Standard of Review**

The California Supreme Court rejected Michaels's prosecutorial misconduct claim as procedurally barred and also rejected it on the merits. Michaels's claim is therefore subject only to deferential review under AEDPA. 28 U.S.C. § 2254(d)(1).

## C. Discussion

To decide if improper comments give rise to a constitutional violation, "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). This standard is difficult to meet under AEDPA, requiring Michaels to "establish that the [state] Supreme Court's rejection of the *Darden* prosecutorial misconduct claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

### 1. Devil-Worship Comments

Turning first to the accusations of devil-worship, Michaels's claim of prosecutorial misconduct relies on a misreading of *Dawson*. In that case, a jury convicted the defendant of first-degree murder after he escaped from prison and robbed and killed a homeowner. *Dawson*, 503 U.S. at 161. During the penalty phase of the trial, the jury heard evidence that the defendant was a member of the Aryan

16

Brotherhood. *Id.* at 162. The jury recommended the death penalty, which the trial court was required to impose under Delaware law. *Id.* at 163. The Supreme Court held that the First and Fourteenth Amendments prohibit a state from "employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried." *Id.* at 168. Michaels argues that his case is analogous to *Dawson* because the devil-worship evidence was evidence of an abstract belief that had no bearing on penalty-phase issues. We disagree.

*Dawson* tells us that "just as the defendant has the right to introduce any sort of relevant mitigating evidence, the State is entitled to rebut that evidence with proof of its own." *Id.* at 167. Here, the jury heard mitigating evidence from Michaels's pastor that Michaels was a member of a Presbyterian church. The evidence of devil-worship was not "employed simply because the jury would find these beliefs morally reprehensible," *id.*, but to rebut Michaels's mitigation evidence of his Presbyterian church membership. And indeed, that is precisely how the prosecutor framed the devil-worship evidence, juxtaposing it with Michaels's mitigating evidence: "We also know that Mr. Michaels was a member of a Presbyterian church in Big Springs, Texas. And you may consider that to be a factor in mitigation. We also know from his tackle box . . . that Mr. Michaels had interests in other types of religion, which I think we call devil worship . . . ." The prosecutor did not commit misconduct by arguing Michaels's interest in devil-worship to the jury based on his own tackle box

17

writings and for the proper purpose of rebutting the mitigating evidence of his membership in the Big Springs, Texas Presbyterian Church.

## 2. The "Thirteenth Juror" Argument

Michaels's prosecutorial misconduct claim based on the "thirteenth juror" argument similarly fails. In *Payne*, the Supreme Court overruled a prior decision, *Booth v. Maryland*, 482 U.S. 496 (1987), to the extent that *Booth* held "that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing." 501 U.S. at 830, 830 n.2. However, the Court left intact *Booth*'s ban on the "admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence" as violative of the Eighth Amendment. *Id.* at 830 n.2. Michaels argues that evidence of his belief in the death penalty violated *Booth*'s ban on "opinions about the crime," and that the prosecutor's argument, that Michaels would have voted for the death penalty in his own case, was not a reasonable inference from the testimony the jury heard from Brohammer. We reject each argument.

First, *Booth* is distinguishable from Michaels's case. There, the Supreme Court held that the "introduction of a [victim impact statement] at the sentencing phase of a capital murder trial violates the Eighth Amendment." *Booth*, 482 U.S. at 509. In one victim impact statement, a family member stated that "such a person" as

18

the defendant could "'[n]ever be rehabilitated.'" *Id.* at 500. But in Michaels's case, the jury did not hear a victim impact statement, but evidence of the *defendant's* own opinion. To accept Michaels's argument would thus require an extension of *Booth* and "'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White v. Woodall*, 572 U.S. 415, 426 (2014) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)). Given the deferential standard required by AEDPA and the limited holding of *Booth*, we cannot hold that clearly established federal law prohibited the admission of the defendant's own views of the suitability of the death penalty during the sentencing phase of the trial.

Second, prosecutors are allowed "to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (quoting *United States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993)). Here, the prosecutor's "thirteenth juror" argument was rooted in testimony that the jury heard at trial. Brohammer testified that Michaels's opinion of the death penalty was that "if somebody commits a heinous crime, that if they deserve it, and if that is what is found to be the punishment, then there should be no problem with it." Although Michaels disagrees with what the prosecutor said, the prosecutor did not unreasonably infer from the testimony that, having been found guilty of a serious crime, Michaels would have voted for the death penalty in his own case. It is also a

19

stretch to say that the prosecutor was making unfair factual inferences from Brohammer's testimony. As it goes without saying that Michaels would not be allowed to serve as a juror in his own case, it is clear that the point was purely rhetorical—not factual.

### 3.    The "Contract Killer" Argument

Michaels also faults the prosecutor for describing Michaels as a "professional" and a "contract killer." During the penalty phase of the trial, the prosecutor, over Michaels's objection, offered for admission into evidence a piece of paper found on Michaels during a prior arrest that the prosecutor claimed was a "hit list." The piece of paper had the words "hit list" written on it repeatedly, along with several names. The court allowed the document to be admitted into evidence for the limited purpose of showing Michaels's perception of himself as a hit man and "that he had a street reputation that he wanted to protect," and not for the purpose of showing that he had actually committed other murders. Michaels argues that when the prosecutor described Michaels as a "professional" and a "contract killer" during his closing argument, he breached his representation to the court and used the evidence for an improper purpose.

The government argues in response that Michaels waived his portrayal as a contract-killer as an issue on appeal by failing to argue it before the district court. *See United States v. Robertson*, 52 F.3d 789, 791 (9thCir. 1994) ("Issues not

20

presented to the district court cannot generally be raised for the first time on appeal."). It is true that Michaels's habeas petition did not allege, in the section on prosecutorial misconduct, that the prosecutor wrongfully accused Michaels of being a contract killer. However, in another section of his habeas petition, in which Michaels faults Chambers for failing to object to comments made by the prosecutor during the penalty-phase closing arguments, Michaels argues that "during closing arguments, the prosecutor argued that Mr. Michaels was a professional killer and a contract killer. The prosecutor knew that this was not true. Such argument constituted serious misconduct, and Chambers did not object."

We agree with Michaels that this language and argument was sufficient to preserve the issue for appeal. However, this does not change the outcome of Michaels's case, as we do not agree that the prosecutor crossed into the proscribed territory of arguing that Michaels had committed other murders. Indeed, at no point did the prosecutor argue that Michaels was responsible for or intended to commit the murder of any of the people who appeared on the hit list. Instead, the prosecutor's arguments were made in the context of quoted material from Michaels's own writings, including other fanciful perceptions of himself as a "lone dark wolf," an "executioner," "the bearer of the sword," and "the justice bringer." The prosecutor was not literally stating that Michaels was any of these things, but rather limited his argument to what he promised the judge—evidence of Michaels's self-perception.

21

Furthermore, even if the prosecutor's argument was ambiguous, though the "consistent and repeated misrepresentation of a dramatic exhibit in evidence may profoundly impress a jury . . . . [i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions. . . . [A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 646-47. Here, the jury was instructed that counsel's arguments were not evidence, and the references to Michaels as a contract killer were minimal, appearing on only two pages of a nearly forty-page closing argument. These isolated comments do not constitute the "sort of egregious misconduct . . . [that] amount[s] to a denial of constitutional due process." *Id.* at 647-48.

### 4. Name-Calling and Emotional Appeals

Michaels's fourth and final claim of prosecutorial misconduct rests on the prosecutor's use of name-calling and emotional appeals during the closing argument. In *Darden*, 477 U.S. at 179-82, the Supreme Court condemned the prosecutor's closing argument because: (1) he called the defendant an animal, (2) he placed blame for the murder on the department of corrections for allowing the defendant a furlough from the prison on the weekend of the murder, and (3) he argued that the death

22

penalty would be the only way to prevent a future crime. However, placed in the context of the entire trial, including the judge's instructions to the jury that attorneys' arguments are not evidence, and the overwhelming evidence of guilt against the defendant, the Court held that these comments did not constitute a denial of due process. *Id.* at 181-83. In *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002), the court held that the prosecutor's description of the attack from the point of view of the victim was misconduct. But the argument did not render the trial fundamentally unfair because of the jury instructions and because, "if he had delivered exactly the same speech in the third person, it would have been proper." *Id.* (internal quotation marks omitted).

Michaels's case bears some resemblance to both *Darden* and *Fields*. Like *Darden*'s description of the defendant as an animal, here, the prosecutor called Michaels a "beast," a "monster," a "psychopath," and "evil." As in *Fields*, the prosecutor here also violated the "golden rule" by asking the jurors to step into the mindset of the victim: "A primal fear we all have, the idea of waking up and having somebody in our bedroom who might hurt us, a stranger. Only it's two men; one of them is a stranger, Popik. The other is a beast, Michaels." But like in *Darden* and *Fields*, we must similarly conclude that Michaels's trial was not rendered fundamentally unfair by the prosecutor's comments.

We are required to evaluate the prosecutor's comments within the context of the entire trial. *Donnelly*, 416 U.S. at 439. As discussed at length above, the jurors heard extensive evidence throughout the trial of Michaels's brutality. As above noted, of the forty-page closing argument, the prosecutor described Michaels's criminal history for nearly eleven pages, while the improper emotional appeal took place on only one page. As in *Fields*, the prosecutor's fault in using the collective "we" while describing the events of the murder was minimal, given that the rest of the prosecutor's account of the attack was properly in the third person. The jurors heard testimony about Michaels's lack of regret for the murder and possible psychopathy, and the trial judge instructed the jurors that the attorneys' arguments were not evidence. Given the context of the entire trial and the deferential standard of review required under AEDPA, we do not agree that the prosecutor's limited improper comments constituted a due process violation.

## III. Ineffective Assistance of Advisory Counsel

In Claim Ten, Michaels argues that he is entitled to effective assistance of advisory counsel. In Claim Eleven, Michaels argues that Chambers was ineffective at both the guilt and penalty phases because Chambers failed to call as a witness Christina's father, who would have corroborated Christina's testimony about how her mother physically abused her. In Claim Twelve, Michaels argues that Chambers was ineffective at the penalty phase because Chambers failed adequately to

investigate and present evidence: (1) that Michaels's mother was bipolar, (2) that Michaels's mother physically and emotionally abused him throughout his childhood, and (3) that Michaels's methamphetamine use was affected by his long-term brain damage, difficult background, and mental illness. Because we hold that Chambers did not render ineffective counsel, we need not decide the threshold question whether Michaels had a right to effective assistance of nominally advisory counsel where, as here, counsel actually conducted the entire trial, including the penalty phase, and made all pertinent decisions.

## A.    Background

Michaels's trial began in April 1990. Before trial, in January 1990, Michaels filed two motions to remove his appointed attorney, Grossberg. Grossberg also moved to be relieved from the case, claiming that Michaels "can't have a fair trial as long as I'm his lawyer." The court denied each motion, and Michaels brought a new *Faretta* motion to represent himself. On February 5, 1990, Grossberg renewed his motion to be relieved as counsel, citing a "complete breakdown" in the attorney-client relationship. The court denied the motion but agreed to have Chambers, Michaels's other appointed attorney, serve as lead counsel in place of Grossberg. During this hearing, the court asked Michaels whether he wanted to pursue his earlier motion to represent himself under *Faretta v. California*, 422 U.S. 806 (1975). Michaels stated that he wanted to represent himself. The court granted the *Faretta*

25

motion after it found Michaels was competent and the waiver of the right to counsel knowing, intelligent, and voluntary. The court then appointed Chambers and Grossberg as advisory counsel.

During the guilt and penalty phases, Chambers conducted the entire defense case, including voir dire, examination of witnesses, opening statements, and final argument. In a post-conviction declaration, Chambers stated that he "made all of the decisions regarding the defense," including the strategy, scope of investigation, witnesses to call, and specific questions to ask the witnesses.

During the guilt phase, the defense argued that Michaels killed Clemons to protect Christina. In support of this theory, the defense relied heavily on Christina's testimony about the severe physical and sexual abuse Christina's mother inflicted upon her. The prosecution argued that the murder was primarily financially motivated, so Christina and Michaels could get Clemons's life insurance proceeds. The jury found Michaels guilty.

During the penalty phase, the defense offered mitigating evidence that Michaels himself was abused by his father, Lynn Miller. Lynn had a drinking problem and became violent towards his family when he drank. When Michaels was three years old, he and his mother witnessed Lynn sexually abuse his six-year-old sister. This incident caused Michaels's mother to take the children and leave Lynn.

Lynn continued to harass the family by tracking them down when they moved, finding the kids on the street, and calling their home to make threats.

When Michaels was thirteen, his mother was raped. A few years later, his sister was raped as well. According to his mother and sister, Michaels became extremely angry upon learning about these incidents and felt helpless. Michaels's mother later began working for a rape hotline and often took calls from home. Michaels was proud of his mother's work and showed concern for the wellbeing of the victims. Michaels's sister testified, "If [Michaels] was involved in this murder, it was because Christin[a] came into his life and that was just one more woman that he could not help. I feel like the helplessness that he felt all his life had just primed him, and when Christin[a] walked into his life, he wasn't going to let it happen to somebody else that he loved."

The evidence also showed that Michaels's mother, Barbara Wilson, was generally supportive and kind. Michaels's sister, Cheryl, testified that Barbara was warm, open, and caring, and was always there when her children needed her. Cheryl testified that Barbara "wanted to make sure that we always felt safe and secure in our home and that nobody could take that away from us." Based on the evidence presented by the defense, the prosecution argued that, despite Michaels's difficult early childhood, Michaels grew up in a relatively comfortable environment.

27

In its final argument, the prosecution undermined the defense's mitigation strategy, commenting that "the defense now at the penalty phase seems to be [Clemons] really got what she deserved, and, gee, the poor guy, Mr. Michaels, he had a rough childhood, he was a victim of playing too much dungeons and dragons." The prosecution also drew attention to the evidence portraying Michaels's family background in a positive light: "I think . . . that we could say . . . he's got a very nice family. His mother appeared to be a very wonderful person; so did his sister. His stepfather appeared to be a good man. They all tried to help Mr. Michaels out, they all tried to present a positive influence on him, and Mr. Michaels turned his back on that support and on that family." After three days of deliberation, the jury returned a death sentence.

During habeas proceedings, Michaels presented additional evidence regarding his childhood and family background and argued that this evidence should have been introduced at trial. Notably, his sister Cheryl told quite a different story about her and Michaels's childhood than she had at trial: rather than "warm" and "always there" for her children, Cheryl stated that their mother was both physically and emotionally abusive toward Michaels throughout Michaels's childhood. Michaels's mother, Barbara Wilson, had a long history of mental illness and was eventually diagnosed with bipolar disorder. In a post-conviction declaration, mental health expert, Dr. Stotland, stated that Michaels had long-term brain damage, which

28

affected him for his entire life. According to Michaels, advisory counsel Chambers's failure to investigate and present evidence of his difficult upbringing provided the jury with an inaccurate depiction of Michaels's life.

Michaels did not raise these issues regarding ineffective assistance by Chambers on direct appeal. *Michaels*, 28 Cal. 4th at 526–27, 539–40. In his first and second state habeas petitions, the California Supreme Court denied Michaels's ineffective assistance of counsel claims summarily on the merits. The district court also denied Michaels's ineffective assistance of advisory counsel claims.

## B.     Standard of Review

The California Supreme Court rejected Michaels's ineffective assistance of advisory counsel claims on the merits. These claims are therefore subject to deferential review under AEDPA. Section 2254(d)(1).

## C.     Discussion

To state a claim for ineffective assistance of counsel, a convicted defendant must show: (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For the first prong, the court asks "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. For the second prong, the court asks "whether there is a reasonable probability that, absent the errors, the

29

sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

Because Michaels's ineffective assistance of advisory counsel claims are subject to deferential review under AEDPA, the proper inquiry is whether the California Supreme Court unreasonably applied the *Strickland* standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Where, as here, the state court rejects a habeas petitioner's claims summarily rather than in a reasoned opinion, the petitioner must show that there was "no reasonable basis for the state court to deny relief." *Id.* at 98. The court "must determine what arguments or theories . . . could have supported the state court's decision . . . [and] whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" prior decisions of the Supreme Court. *Id.* at 102. Put another way, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

### 1. Testimony of Christina's Father

Michaels argues that Chambers should have introduced the testimony of Christina's father, Wendell Clemons, to corroborate Christina's testimony that her mother abused her. Christina was tried in juvenile court in November and December 1988 for her role in JoAnn Clemons's death. Wendell testified at Christina's juvenile court trial that JoAnn Clemons inflicted violence on Christina, and Michaels argues

30

that Chambers was deficient for failing to elicit similar testimony at his own trial. We hold that the California Supreme Court could have reasonably determined that the failure to introduce such evidence did not constitute deficient performance.

We first address Michaels's argument that the omission of Wendell's testimony was per se deficient because Chambers admitted that it was not a tactical decision, and he simply did not think to introduce the evidence. Michaels relies on *Doe v. Ayers*, 782 F.3d 425, 444–45 (9th Cir. 2015) for the proposition that an attorney's performance is necessarily deficient when he admits that a particular action or inaction was not a strategic decision. Michaels's reliance on *Doe* is flawed because he misstates the holding in *Doe*, the claims in *Doe* were not subject to AEDPA, and the facts of *Doe* are distinguishable from those of the present case. *Id.* at 429, 444–46.

In *Doe*, the petitioner sought habeas relief for ineffective assistance of counsel at his criminal trial. *Id.* at 429. In preparation for the penalty phase, defense counsel did not obtain readily available mitigating evidence, conducted only perfunctory interviews with the defendant, did not inquire about the defendant's history of trauma, did not follow up with the retained psychological expert, and did not prepare the penalty-phase witnesses for trial. *Id.* at 435–43. Defense counsel conceded that this conduct was the result of inattention rather than strategy, stating, "[I]t's hard for me to say what my [penalty-phase] strategy was." *Id.* at 444. The court found the

31

attorney's conduct deficient based on overwhelming evidence of poor performance, including the attorney's admission that he had no strategy. *Id.* at 445. The opinion states, "The presumption that the defense counsel's conduct falls within the wide range of reasonable professional assistance is inapposite . . . when we know for sure that defense counsel had no strategy, because he has unequivocally said as much." *Id.* at 444.

*Doe* addressed a situation where the defense attorney had no penalty-phase strategy. It did not hold, as Michaels suggests, that an attorney must consider every possible item of mitigating evidence and make an affirmative decision whether to include each item. Such a holding would be contrary to the objective nature of the *Strickland* standard. *Strickland*, 466 U.S. at 688; *Richter*, 562 U.S. at 109 (explaining that counsel need not "confirm every aspect of the strategic basis for [his] actions" because "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

*Doe* is also distinguishable from the present case. Here, the record shows that Chambers prepared for trial by setting the scope of investigation, interviewing members of Michaels's family, preparing witnesses to testify, retaining multiple mental health experts, making decisions as to which arguments to make and not make, and requesting continuance to allow for further preparation. Chambers's behavior is therefore not analogous to that of the attorney in *Doe*, who lacked a

penalty-phase strategy altogether. Accordingly, the fact that Chambers admitted that he did not consider calling Wendell as a witness does not render the omission per se deficient.

We next address whether there is a reasonable basis to find that the omission of Wendell's testimony was not deficient. At Christina's juvenile court trial for her role in Clemons's death, Wendell testified that Clemons would beat Christina until Clemons was tired. Wendell testified,

> When [Christina] didn't cry, [JoAnn] just kept going and going and going. Later on . . . she would stop beating her with something and just start pummeling her with her fist, beating her about the head and shoulders with her fist . . . . She would beat her on the floor. Then she would kick her. And then she would beat her some more. And then she would pick up something [else] to beat her until she just got too tired to beat her any more.

When Clemons was too tired to beat Christina, she had Wendell beat her. He complied because he was afraid of Clemons, who threatened to kill him and regularly attacked him with knives and other objects.

Wendell's testimony is undoubtedly powerful. Christina, however, provided her own powerful testimony at Michaels's trial. During the guilt phase, Christina testified to the details of abuse she had relayed to Michaels. She told Michaels that her mother physically and sexually abused her. She said that her mother would become violent and then inappropriately touch her. Christina also told Michaels that she was at one point removed from her home by child protective services because of her mother's abuse. She told him about a camping trip during which her mother hit

33

her with a cast iron pot that had been heating on a fire grate, then later performed sexual acts on Christina, including penetration and oral copulation. Christina also told Michaels about a particularly bad fight in which Clemons choked Christina so hard that Christina thought she would die and then severely beat her. Christina testified to all these details at trial, and the trial judge instructed the jury to limit the testimony to the impact it would have on Michaels and not consider the truth of the underlying allegations of abuse.

Michaels argues that corroboration of this testimony was crucial because Christina's credibility was undermined by the prosecution and her testimony was limited to its effect on Michaels. But whether the abuse actually occurred was not at issue in the case, and corroboration was relevant only to the extent that it could help the jury determine if Michaels's belief that Christina was abused was sincere. *United States v. James*, 169 F.3d 1210 (9th Cir. 1999) (*en banc*).[1] Given that Christina testified in front of the jury as to the stories she told Michaels, the jury had its own

---

[1] Michaels cites *James* for the proposition that corroborating evidence is "crucial." In *James*, the issue was whether court records corroborating violent stories the victim told the defendant were relevant to the defendant's self-defense claim, and therefore admissible. The court found such evidence relevant for the purposes of (1) proving that the defendant did not make up the stories and (2) proving that the defendant heard the stories from a man who had actually committed the acts described, and was therefore more likely to believe his descriptions. In the present case, there is no question that Christina actually told Michaels stories about her abuse. The only relevance of the corroborating evidence is that it would have tended to prove Christina was convincing when she described her abuse to Michaels, and thus that Michaels's belief that the abuse happened was genuine.

opportunity to evaluate the persuasiveness of these stories. It was therefore less important that Christina's stories be corroborated than in cases involving stories told by persons unavailable at trial. *See, e.g., id.* at 1214 (holding that evidence corroborating violent stories told to the defendant by the deceased victim was relevant to the defendant's self-defense claim because it tended to prove that the defendant's fear of the victim was genuine). Also, other than general attacks on Christina's credibility, there was no evidence tending to prove that Christina's mother did not abuse her. Corroboration was thus not particularly important.

In support of his argument that corroboration was crucial, Michaels asserts that the trial judge commented that the abuse evidence did not make Michaels's beliefs reasonable. Michaels refers to the trial judge's statement that, "Although the defendant felt he could protect Christina Clemons by murdering her mother . . . the court does not find his reaction by homicide a reasonable belief, despite feelings that he himself felt justified." According to Michaels, this statement asserts that the court did not find his belief *that Christina was abused* to be reasonable, rendering corroborating evidence necessary. Michaels distorts the trial judge's statement. The plain meaning of the statement is that Michaels's belief *that murder was justified* was unreasonable. Nothing in the trial court's language implies that Michaels did not have a genuine belief that Christina was the subject of abuse.

35

Moreover, the jury did hear evidence tending to prove that Michaels's belief that Christina was abused was reasonable. Dr. Hubbard testified that he himself believed Christina had been sexually abused. He based this opinion on information told to him by Christina, information documented by doctors, social workers, and psychologists, and observations from his clinical psychiatric assessment of Christina. For example, Christina preferred bondage and abuse during sex, which, according to Dr. Hubbard, is typical of individuals who have been sexually abused. Thus, although the jury did not hear from anyone who witnessed the abuse of Christina first-hand, it was presented with evidence tending to corroborate her history.

Michaels also argues that corroboration was crucial because the prosecution undermined Christina's credibility. Again, the issue is not whether Christina was telling the truth when she testified at trial to the abuse inflicted upon her by her mother, or whether she was telling the truth when she told Michaels about this abuse. The issue is whether Christina actually told Michaels that she was abused by her mother, and whether Michaels believed her. The fact that Christina told Michaels about her mother's abusive behavior and the fact that Michaels believed her were corroborated by Dr. Hubbard, who testified that Michaels saw Christina as "a woman . . . who had been extensively abused." Thus, to the extent that it would prove

Christina told Michaels that she was abused, Wendell's testimony would be cumulative.

Although additional corroborating evidence may have strengthened a determination that Michaels's belief in the abuse was genuine, and in turn strengthened a determination that Michaels's purported motivation to kill Clemons to protect Christina was genuine, the absence of such evidence did not deprive the jury from considering this theory of mitigation—Christina's own testimony was adequate to the task. Moreover, that Wendell did not testify at Christina's trial to any *sexual* abuse by Christina's mother further reduces the importance of Wendell's corroborative testimony because a central theme of Michaels's defense was his self-image as a protector of women against *sexual* abuse specifically. *See infra* Section III.C.3.

Given the limited probative value of Wendell's testimony, the California Supreme Court could have reasonably concluded that the failure to produce such testimony was not "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (holding that it was within reason for counsel not to pursue additional testimony that would have been largely cumulative of the testimony offered at trial).

### 2. Bipolar Disorder

Michaels argues that Chambers was deficient for failing to present evidence of Michaels's mother Barbara's bipolar disorder, because Barbara's mental illness could have been discovered by a proper investigation. This argument is unsupported by the record. First, Michaels has not shown that Barbara's bipolar disorder had been diagnosed at the time of trial. In support of his claim, he offers only a 1998 declaration of mitigation specialist Ellen Rogers, who was engaged post-trial for the habeas proceedings, declaring that Barbara believed she suffered from bipolar disorder for many years but was diagnosed only "recently." Remember, Michaels's trial took place eight years earlier, in April 1990. Rather than establish that Barbara's bipolar disorder was known at the time of trial, Ellen Rogers's declaration suggests the contrary.

Second, Michaels has not shown that Chambers was on notice that Barbara might have had bipolar disorder or a similar condition. In her 1998 declaration, Rogers states that Barbara began to take anti-depressants as early as 1981, was hospitalized for depression in 1982, and attempted suicide at age 19. The declaration notes that Barbara did not receive medical attention following the suicide attempt, so it is unclear whether this attempt was documented at the time of trial. Regardless, these facts do not tend to prove the fact that Barbara's bipolar disorder was known at the time of trial or that Chambers was on notice that further investigation into Barbara's mental health would have uncovered additional mental illnesses. Rather,

38

these facts are consistent with a finding that Barbara was merely depressed. Accordingly, the California Supreme Court could have reasonably found that Chambers was not deficient in failing to inquire further into Barbara's mental health. *See Babbitt* at 1174 (holding that counsel was not ineffective for failing to uncover a family mental illness where, after a reasonable investigation, nothing had put counsel on notice of the illness).

### 3. Childhood Abuse

At trial, Michaels's sister Cheryl testified that their mother Barbara was "a very warm, open and caring mom" who "was there whenever we needed her" and "forfeited a lot of her own, quality personal time to dedicate to us and make sure that we didn't want for anything." Barbara testified that the abuse inflicted by her husband upon Michaels in his early childhood ended when Michaels was three years old. She denied doing anything more than spanking Michaels and testified that anything Michaels said to the contrary was false.

During habeas proceedings, Cheryl changed her story and declared that Barbara "did far more than spank" her children. Cheryl declared that Barbara frequently "lost control" and "beat [her children] until she was tired," once breaking a hairbrush on Michaels. In addition, Barbara emotionally abused Michaels by blaming all her problems on him, telling him she wished she never had him, comparing him to his abusive father, and threatening to leave him forever. Cheryl

39

declared that she did not tell the investigators or Chambers about her mother's abusive behavior prior to the trial because they did not ask her many questions about Barbara and because she felt a need to protect her mother.

Michaels argues that Chambers's failure to introduce evidence of Barbara's abusive behavior was deficient because Chambers admitted that he did "not consider trying to show that [Michaels's] mother physically and psychologically abused her son because [he] did not have enough background on her and . . . did not have enough time to develop such background." According to Michaels, Chambers admitted in this statement that his failure was not a tactical decision, so the court must not apply a presumption of reasonableness.[2]

Michaels mischaracterizes the facts. Chambers did not assert that he had no strategy for the penalty phase or that he had no strategy for investigating Michaels's background. Rather, Chambers declared that he specifically did not pursue an investigation of Barbara's parenting because he did not have the time to develop the necessary background. Part of an attorney's job is to allocate time and resources in preparing a defense, and limitations on time and resources must be considered when evaluating the reasonableness of an attorney's conduct. *Strickland*, 466 U.S. at 691

---

[2] Michaels once again relies on a misstatement of the holding in *Doe* to argue that the court should not apply a presumption of reasonableness to Chambers's conduct because of a claim that Chambers had no strategy at all for the penalty phase. This argument fails for the reasons stated in Section III.C.1.

("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

Chambers had limited time to develop a strategy after the trial court denied the defense's request for a six-month continuance. Given the limitations on his defense, Chambers had to decide which investigations would be most useful. One of Chambers's considerations was his impression that Barbara did not want to disclose her past, an impression corroborated by daughter Cheryl's testimony at trial of Barbara's caring attention to Michaels. In contrast, Chambers was able to elicit ample testimony from both Barbara and Cheryl as to the sexual abuse suffered by the women in Michaels's life and the helplessness Michaels felt for being unable to protect them, leading to his protective feeling toward Christina. We agree with the district court that focusing investigative resources on these fertile areas of mitigating evidence was a sound strategy. *See Richter*, 562 U.S. at 107 ("An attorney can avoid activities that appear 'distractive from more important duties.'" (quoting *Bobby v. VanHook*, 558 U.S. 4, 11 (2009) (*per curiam*))). Taking into account all circumstances, as *Strickland* requires, it would not be unreasonable to conclude that Chambers's decision not to investigate further into Barbara's abusive conduct was reasonable.

### 4. Drug Use and Brain Damage

41

Michaels faults Chambers for failing effectively to tie evidence of Michaels's drug abuse to his background and offense conduct. "Had [Chambers] conducted a proper investigation," Michaels argues, "[he] could have presented a much more compelling mitigation presentation that Mr. Michaels had struggled with long-term and significant brain damage for his entire life, likely caused by the beatings he suffered as a young child, and he was genetically predisposed to mental illness and addiction, and began to self-medicate with methamphetamine as a means of coping with the trauma of his life."

Much of this argument fails for the same reasons discussed in Section III.C.3. Namely, these assertions rest on the notion that Chambers should have conducted a more extensive investigation into Michaels's background, but there is a reasonable argument that Chambers's investigation was not deficient given the time limitations on the defense. Michaels asserts that Chambers should have investigated the abuse Michaels suffered during his childhood, the mental illnesses that ran in Michaels's family, and the history of addiction in Michaels's family. Similarly, Michaels argues that Chambers should have retrieved certain social and medical records for the purpose of sufficiently informing the mental health experts. But Michaels has not shown that Chambers's decisions regarding how to allocate investigative resources were unreasonable under the circumstances.

We reiterate that Chambers did not fail to conduct any investigation into or present any evidence of Michaels's childhood. Michaels's mother and sister both testified to the abuse and harassment inflicted on the family by Michaels's father, the financial difficulties the family faced during Michaels's childhood, as well as Barbara's weight problem and its effect on the family. Multiple witnesses testified that Michaels was a lonely child who had trouble making friends. Dr. Hubbard testified that Michaels was depressed during his childhood and tried to commit suicide at age eleven, which, in his opinion, showed that Michaels was "emotionally disturbed" from having grown up in a "disastrous family setting."

Chambers also investigated and presented evidence of Michaels's mental health and drug use, retaining multiple mental health experts at the time of trial, including psychologist Dr. Stotland to perform testing and evaluation, and psychiatrist Dr. Hubbard to analyze the results and testify at the trial's penalty phase. Dr. Hubbard testified that Michaels suffered from chemical dependency, major depressive disorder, latent schizophrenia, a mixed personality disorder, and mild brain dysfunction. He explained his basis for these diagnoses and the effects of each disorder on Michaels's functioning. Dr. Hubbard also described Michaels's methamphetamine use and explained that methamphetamine can particularly distort reality for individuals with underlying schizophrenic thought disorders. He did not

believe Michaels was firmly in touch with reality on the night of the murder because Michaels had taken a large amount of methamphetamine.

Chambers stated during habeas proceedings that he would have done more preparation had time permitted, including conducting a more thorough investigation of Michaels's family history, interviewing employees from the Department of Social Services, obtaining Michaels's school records, and contacting witnesses who knew Michaels during his time in the military. But it is clear from the record that Chambers had to decide which theories of mitigation were relatively worth pursuing given the restrictions on time: Michaels as protector of Christina, or Michaels as victim of his family. Michaels cannot overcome the strong presumption that Chambers's decisions under these circumstances were reasonable.

Michaels also faults Chambers for failing to present evidence that Michaels suffered from long-term brain damage. Dr. Hubbard testified during the penalty phase that Michaels suffered from brain damage that likely occurred after high school. Dr. Stotland, who conducted testing on Michaels prior to trial, declared during habeas proceedings that Michaels suffered from long-term brain damage and that, had he been called to testify at trial, he would have presented this fact to the jury. Michaels argues that, by inaccurately presenting his brain damage as short-term, rather than long-term, Chambers allowed the prosecution to depict Michaels

44

as having lived a relatively normal life before his drug use, rather than having turned to drugs as a means of coping with his difficult personal history.

Michaels does not argue that Chambers should have had Dr. Stotland testify instead of Dr. Hubbard, nor does he argue that Chambers should have had both experts testify. It is unclear how Michaels thinks Chambers should have introduced evidence that Michaels suffered from long-term brain damage. If Michaels means to argue that Chambers should have had Dr. Hubbard testify and offered separate evidence of Michaels's long-term brain damage, he fails to show that Chambers's decision not to undergo this course of action was deficient. In addition to testifying that Michaels had short-term brain damage, Dr. Hubbard testified about Michaels's mental impairments, dependent personality, childhood trauma, and relationship with Christina, as well as the impact of these conditions on Michaels's behavior. Offering evidence that directly conflicted with one of Dr. Hubbard's expert opinions would have tended to discredit Dr. Hubbard's expertise and cast doubt on the valuable portions of his testimony. The California Supreme Court therefore reasonably could have found that a decision not to introduce such conflicting evidence was not deficient performance.

## IV.   CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's denial of habeas relief on all claims.

45

*Michaels v. Davis*,
No. 15-99005

**BERZON, Circuit Judge, dissenting:**

I concur in the per curiam opinion. I dissent from Judge Bea's opinion for himself and Judge Gould ("Majority Opinion") with respect to the holding that the admission of Michaels's confession and the Popik note did not cumulatively prejudice the penalty phase of the trial.[1] I would hold the introduction of Michaels's complete improperly *Mirandized* confession and of the Popik note cumulatively prejudiced Michaels at the penalty phase of his trial, and would therefore grant the petition as to the penalty phase.

Although the Majority Opinion correctly considers the issue of cumulative prejudice under *Brecht* without AEDPA deference, it fails to appreciate the possible influence of the improperly admitted evidence on the jury's death sentence. The Majority Opinion finds no prejudice, cumulative or otherwise, as to the penalty phase. As the Majority Opinion summarizes the record, the improperly admitted evidence was infrequently invoked and cumulative of other properly admitted evidence. Both characterizations are contrary to the record. Further, the

---

[1] Because I would grant Michaels's petition with respect to the penalty phase for the reasons explained in this dissent, I do not express any opinion regarding the other issues the Majority Opinion addresses.

1

Majority Opinion fails meaningfully to consider the improper evidence in relation to the substantial evidence in mitigation.

The Majority Opinion's errors are critical because *Brecht*'s harmless error inquiry "is not a matter of pure logic, but of sensitive judgment based on the case presented to the jury by the prosecution and the defense." *United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003). In contrast to the guilt phase, in the penalty phase, "the jury's role is relatively unconstrained in deciding whether to opt for mercy and life rather than the most extreme punishment of death." *Walker v. Martel*, 709 F.3d 925, 945 (9th Cir. 2013) (Gould, J., concurring in part). Here, the jury was instructed during the penalty phase, "you are free to assign *whatever moral or sympathetic value you deem appropriate* to each and all of the various factors you are permitted to consider." The jury was further instructed: "[T]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are *so substantial in comparison with the mitigating circumstances* that it warrants death instead of life without parole."

Given the broad discretion accorded to the jury "to show mercy and spare life based on any consideration in [the defendant's] background or character," we "must remind ourselves . . . that the possibility of mercy, like the possibility of gentle rain, is not predictable with certainty." *Mayfield v. Woodford*, 270 F.3d 915, 934, 938 (9th Cir. 2001) (Gould, J., concurring). In this case, the jury deliberated

2

for more than three days before returning a death sentence. For the reasons explained below, I harbor grave doubt that the harmless error standard is met here. I cannot conclude that there is no reasonable probability that a single juror might have spared Michaels had the confession and the note been excluded from evidence at the penalty phase.

**A.**

When considering the cumulative prejudice of the confession and the Popik note, the Majority Opinion omits any meaningful discussion of the evidence presented in mitigation. *See* Majority Op. at 3–11. But, as I shall explain, to assess properly the degree of harm the prosecution's errors caused, we need to include in the analysis the weight of the mitigation evidence. I therefore begin by explaining why the substantial mitigation evidence presented during the penalty phase enhanced the likely prejudicial impact of the improperly admitted evidence at the penalty phase.

Here, the government's case for the death penalty was up against substantial mitigation evidence. Errors favoring the government's case were therefore more likely to be prejudicial. Given the strength of the mitigation evidence, relatively modest subtractions from the government's aggravation evidence, or additions to the mitigation evidence via enhancing the credibility of the mitigation witnesses, could have swung at least one juror's conclusion regarding whether "the

3

aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

The record shows that Michaels provided the jury with extensive mitigation evidence. For example: Michaels presented evidence that he served in the military. A medical expert testified that Michaels suffered from major depressive disorder and mixed personality disorder with depressive, dependent, antisocial, and borderline features. *People v. Michaels* (*Michaels I*), 28 Cal. 4th 486, 507 (2002). The jury further learned that Michaels had mild brain dysfunction, probably from use of methamphetamine or from an injury in an auto accident. *Id.* at 507. As the Supreme Court has recognized, both kinds of mitigation evidence—military service and mental health issues—can be influential with a penalty phase jury. *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 42–44 (2009).

The defense's main argument in mitigation was that Michaels understood himself as a protector, particularly of victims of sexual assault, and that this perception of responsibility for the welfare of such victims influenced his decision to commit the murder. In support, the defense presented evidence of traumatic experiences in Michaels's childhood, which, it was argued, both lessened his moral culpability and led to his self-image as a protector of abused women.

Both Michaels's sister, Cheryl, and his mother, Barbara, testified that his father was a violent alcoholic who beat Michaels and his mother. *Michaels I*, 28

4

Cal. 4th at 506. As a child, Michael witnessed his father sexually molest his six-year-old sister. After his parents separated, Michaels's father continued to harass the family; the family moved frequently to avoid him. In one instance, Michaels's father tried to run over Michaels and his sister with a car, and then attempted to kidnap them. At eleven, Michaels attempted suicide. At thirteen, he found out that his mother had been raped. A year later, he learned that his sister also had been raped. These events devastated Michaels because, according to his sister and mother, he considered it his responsibility to protect them. *Id.* at 506–07.

Defense counsel connected this trauma and shame to Michaels's desire to protect his girlfriend, Christina Clemons, from her mother. Christina was the defense's only witness in the guilt phase. She described in detail how her mother had physically and sexually abused her from an early age. *Id.* at 504. Christina testified that this abuse had continued, that her mother had assaulted her on two overnight visits that occurred shortly before the murder, and that she had told Michaels about those incidents. *Id.*

In support of the theory that Michaels's childhood trauma and his girlfriend's situation lessened Michaels's moral culpability, defense witness Dr. Hubbard, a psychiatrist, testified that, in his professional opinion, "the sexual abuse of Christina Clemons was *the key motivating factor* in . . . [the] murder of JoAnn Clemons," not the potential insurance money to be gained. Additionally, Dr.

5

Hubbard diagnosed Michaels with major depressive disorder, latent schizophrenia, and mixed personality disorder. On the mitigation evidence Michaels presented, the jury could have concluded that Michaels's motive for carrying out the murder was ending Clemons's physical and sexual abuse of Christina.

Of the mitigating evidence presented to the jury, the Majority Opinion acknowledges only this last "potential[ly] mitigating" circumstance—the possibility "that Michaels's motive for the crime was to protect Christina from Clemons's physical and sexual abuse." Majority Op. at 9. Addressing this possibility, the Majority Opinion simply notes, "the jury also heard evidence," including from Christina's testimony, "that Michaels was not Christina's protector, but another abuser." *Id.* This observation has no bearing on the mitigating motive for Michaels's crime. It is entirely consistent that Michaels could have been violent toward Christina—at least once, in her telling, in self defense, when she went toward Michaels with a knife—*and* motivated to take action to protect her from violence by other people.

**B.**

Strong as the mitigation case was, it was weaker than it would have been had the improperly admitted portions of the confession and the Popik note not been used to cross-examine mitigation witnesses. Additionally, the improper evidence played a prominent role during the government's presentation of evidence, and in

6

its closing argument. The impact on the jury of both uses of the improperly admitted evidence was likely significant.

### 1. During Presentation of Evidence

The Majority Opinion omits entirely the prosecutor's many references to the confession and the note during the presentation of evidence in the penalty phase. Early on, the prosecution played the entire unedited confession for the jury; only a portion had been played during the guilt phase. The prosecution consistently used the confession and the note both to undermine the credibility of witnesses Michaels offered in mitigation and to bolster its negative portrayal of Michaels during its own presentation of aggravation evidence.[2]

*(i) Cross-examination during the mitigation case:* When the defense called Michaels's sister, Cheryl Goldenberg, to testify on his behalf, the prosecutor used the confession on cross-examination to undermine the credibility of her mitigation.

> Q: How do you feel about him joking about raping a woman that he murdered?
> A: I don't believe that he joked about raping anybody.
> *Q: You haven't heard the tape, have you?*

---

[2] It is error for the prosecution to use confession statements obtained in violation of *Miranda* to impeach the credibility of any defense witness other than the defendant. *See James v. Illinois*, 493 U.S. 307, 313–14 (1990). Using a confession to impeach the defendant's credibility, moreover, is only permissible when the defendant, or a witness relaying his hearsay, has first opened the door by making "statements that directly contradict the suppressed" confession. *Id.* at 314; *see also United States v. Rosales-Aguilar*, 818 F.3d 965, 970 (9th Cir. 2016). Here, Michaels did not testify, so use of the confession on cross-examination was error. *See James*, 493 U.S. at 320.

A: No.

After Goldenberg indicated that she didn't know whether Michaels committed the murder, the prosecutor also asked, "Are you aware that [Michaels] has confessed to the murder?" The prosecutor also used the Popik note while cross-examining Goldenberg. The prosecutor asked her on cross-examination, "Are you aware your brother in that note . . . *threatened to hurt Popik* during the preliminary examination?"

After Michaels's mother testified and offered mitigating evidence, the prosecutor similarly sought to undermine her credibility on cross-examination by invoking the confession:

> Q: *Are you aware that he joked all the time about raping the woman that he murdered?*
> A: No. Not that he joked all the time about raping anybody.
> Q: *He told the police that he joked about it* and that he always joked about it, raping a woman he murdered.

The prosecutor also mentioned the confession while cross-examining Steven Waltzman, although defense counsel's objection was sustained.

> Q: *He confessed to cutting a woman's throat after waiting outsider of her apartment for three hours for her to go to sleep.* How do you feel about him knowing that he has done those things?

The prosecutor similarly cross-examined Rev. Flynn Long Jr., Michaels's pastor who testified to offer mitigating evidence:

> Q: And it is your belief, based on all of that experience, that Mr. Michaels is not a violent man?

A: Yes.

*Q: Do you continue to hold that belief knowing that Mr. Michaels confessed to waiting outside a woman's apartment so she could go to sleep so he could cut her throat?*

Mr. Chambers: Argumentative.

The Court: Overruled.

A: I hadn't heard that until you just told me.

Mr. Brodrick: Okay, now that I told you that, is he a violent man or not?

During a later part of the same cross-examination, the prosecutor referenced the confession again:

Q: Did anyone tell you that Mr. Michaels, when discussing what he had done to the police, described cutting this woman's throat and laughed about it?

A: No.

The prosecution also asked Dr. Bruce Hubbard, Michaels's psychiatrist, whether his diagnosis of Michaels was "consistent with him laughing on the tape when he described the murder?"

*(ii) Government's aggravation evidence:* The trial court had originally refused to admit the Popik note during the penalty phase, and permitted the prosecution to introduce it only to rebut the evidence put on in mitigation that Michaels was not a violent person. As the prosecutor explained to the trial court, the defense "put on a host of witnesses to say that the defendant is not violent, they put a minister on to say that, even the last witness said he is not going to be violent in the future. They put on a psychiatrist to say that he is a follower and not a

9

leader. They put on a stepfather to say that he is not a bully. I am entitled to rebut each and every one of those pieces of evidence." The court agreed.

As a result, the *entire* focus of the prosecution's rebuttal testimony—offered by Bailiff Steven Lazarus, Court Reporter Elaine Cohen, and Michaels's former attorney Charles Duff—was the Popik note. The prosecutor was able to use the note to elicit damaging testimony about Duff's view as to Michaels's potential dangerousness.

> A: … I just knew that I didn't want to be the only person that knew the contents of that note if something went wrong in the courtroom.
> Q: Why was that?
> A: Well, I would have felt responsible.
> Q: Responsible for what?
> Q: For not telling the proper people, the judge or the bailiff or something that there is a possibility that something could happen.
> Q: *Possibility of violence?*
> A: Correct?
> A: *Yeah.*

As this testimony about the Popik note was "among the last words the jurors heard before they were sent to deliberate," the note likely had a heightened prejudicial effect. *Zapata v. Vasquez*, 788 F.3d 1106, 1122–23 (9th Cir. 2015).

### 2. During Argument

The majority notes that the confession had "diminished importance" in the penalty phase because the prosecutor relied on it "infrequently during its closing argument." Majority Op. at 4. Counting the number of times improperly admitted evidence was mentioned in closing is not alone a useful way to measure its likely

impact. Rather, the question under *Brecht* is the likely impact of such references on the jury verdict, which could be the product of the language used in referring to the improper evidence, its placement in the argument sequence, or its inherent persuasive value, not simply how often it was mentioned. *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993).

Here, the prosecutor emphasized the confession as extremely significant, stating, "probably the tape is *one of the most horrible and aggravated parts of the case*." The prosecutor also referenced a specific portion of the confession as evidence that Michaels was a particularly dangerous man: "Here he is describing a man beating a woman black and blue and his assessment of it is, 'I will give him that much, he went ballistic.'" Confessions have a "profound impact on the jury" such that jurors may be unable "to put them out of mind even if told to do so." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139–40)). When the jury is *not* so instructed, and the prosecution presents and emphasizes the confession during closing argument, a confession is especially likely to "ha[ve] a substantial and injurious effect or influence on the jury." *Garcia v. Long*, 808 F.3d 771, 783 (9th Cir. 2015).

Further, the prosecutor in closing argument repeatedly used material that came directly from Michaels's confession, without mentioning the confession itself, in describing the aggravating nature of the crime. For example, the

11

prosecutor stated, "This is a man who rips a lady's throat *and then laughs about it and tells us that it is justice*"—an account based on Michaels's confession. The prosecutor went on, "This is . . . a . . . man who dripped blood on JoAnn Clemons as she laid beneath him. *Cut jug to jug.* He feels no remorse. *All he can do is laugh about it*"—again referencing, though not explicitly mentioning, the confession. Regarding the Popik note, the Majority Opinion characterizes it as having "minimal evidentiary value" and being of "limited use" during the trial. But when the prosecutor mentioned the Popik note in closing argument, he said that Duff, who testified about the note, was "perhaps my favorite witness," and that Michaels "is a man who is so dangerous that a mere note is a call for immediate action."

## C.

Nor was the evidence improperly admitted in the penalty-phase merely cumulative of other evidence.

### 1. The Confession

The Majority Opinion asserts that Michaels's "confession was redundant evidence for each point the prosecutor used it to prove," Majority Op. at 8, and further, that the confession actually "helped support the defense's own theory" of Michaels's motive, *id.* at 11. This assessment ignores relevant case law on the staying power of a confession in the minds of jurors, *see supra* p. 11, and also misstates the record on the nature of the other evidence before the jury.

Again, a primary reason why the improperly admitted evidence cannot be considered cumulative of other properly admitted evidence is that "[a] confession is like no other evidence." *Fulminante*, 499 U.S. at 296. "[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Id*. (internal citation omitted).

The especially damaging nature of confession evidence is directly relevant to the *Brecht* harmless error standard. That standard, again, focuses on whether the error "has substantial and injurious effect or influence *in determining the jury's verdict*." *Brecht*, 507 U.S. at 623 (emphasis added) (quoting *Kotteakos v. United States*, 328 U.S. 750, 766 (1946)). *Kotteakos* specified that "the question is . . . not were [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision." 328 U.S. at 764. Justice Stevens's concurrence in *Brecht*, which provided the majority opinion's fifth vote, emphasized this language in *Kotteakos*, noting, "[t]he habeas court cannot ask only whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place. . . . [*Kotteakos* requires the court to] decide that 'the error did not influence the jury,' and that 'the judgment was not substantially swayed by the error.'" *Brecht*, 507 U.S. at 642 (Stevens, J., concurring) (quoting *Kotteakos*, 328 U.S. at 764–65).

Further, "[w]here a trial court commits an evidentiary error, the error is not necessarily rendered harmless by the fact there was other, cumulative evidence properly admitted." *Parle v. Runnels,* 505 F.3d 922, 928 (9th Cir. 2007) (internal quotation marks and citation omitted). In a "close case, erroneously admitted evidence—even if cumulative of other evidence—can tip the scales against the defendant." *Id.* That concern—that the very cumulation may be what tipped the jury—is particularly apt in this case. Here, the improperly admitted evidence included a confession to the police, and the jury decision at issue is the death penalty, a decision as to which the jury has wide sway to exercise its moral convictions, with only the most general legal standards as a guide.

The Majority Opinion suggests that even though the confession provided evidence of the facts underlying the aggravating factors of lying in wait and murder for financial gain, the confession was cumulative, or duplicative, of other testimony to the same effect, rendering the introduction of the confession harmless error. *See, e.g.*, Majority Op. at 2–3, 6, 8-9. But, to borrow the standard from the related circumstance in which a juror introduces extraneous evidence into jury deliberations, "[t]o be truly considered cumulative, there must be *an extremely close relationship* between the extrinsic evidence and the evidence actually admitted." *Eslaminia v. White*, 136 F.3d 1234, 1239 (9th Cir. 1998) (emphasis added). For example, *Hughes v. Borg*, 898 F.2d 695 (9th Cir.1990), deemed an

14

unadmitted police report cumulative "because one witness' testimony was an 'almost word for word verbatim' recital of the information in the police report.'" *Eslaminia*, 136 F.3d at 1239 (*citing Hughes*, 898 F.2d at 701).

Here, there is no such close similarity. Michaels's confession was significantly more detailed and damaging than the assertedly duplicative testimony cited.

### i. The confession was not merely cumulative of other evidence ostensibly showing that Michaels lay in wait.

The Majority Opinion cites a single exchange between the prosecutor and Dr. Hubbard during the penalty phase as cumulative of Michaels's statements in his confession showing that he waited for JoAnn Clemons to go to sleep before entering her apartment. *See* Majority Op. at 6-7. This is the entirety of the referenced exchange:

> Q: What did he tell you about the murder itself?
> A: The murder itself. I have that he went to the apartment and JoAnn was at work. Went back about 5 o'clock. *Something about a wall and killed time.* And he comes back at 12:00 midnight."

By contrast, Michaels's confession, provides extensive detail about his preparation for the crime:

> Q: So that's the only reason you waited, because you wanted to ensure you had a ride.
> A: No, we wanted her asleep.
> Q: Why did you want her asleep?
> A: A little less noisy.
> [. . .]

15

Q: What happened right after you got inside the door [to the apartment]?
[. . .]
A: Pointed the door out. I looked to the bedroom [. . .] Pointed it. Put certain things down on the couch that would make noise that were on my person; a wallet with a chain on it . . . all kinds of other shit. Went to the bedroom, and everything fucking broke loose.
[. . .]
Q: You didn't turn the light on or anything?
A: Uh uh. The whole point was not to wake her.

This portion of Michaels's confession, in the prosecutor's words (from the guilt phase), "tell[s] us that the very time of the murder, he wanted the ambush to be in effect. He wanted to attack that woman even as she slept. . . . The whole point of this elaborate and evil and treacherous murder was to strike at a time when JoAnn Clemons couldn't even resist." Comparing these two pieces of evidence side by side reveals that Michaels's confession is far more than a mere duplication of Dr. Hubbard's sparse testimony that Michaels "[w]ent back about 5 o'clock. Something about a wall and killed time."

> ii. **The confession was not merely cumulative of other evidence ostensibly showing Michaels had a financial motive.**

The Majority Opinion cites multiple exchanges regarding Michaels's financial motive as cumulative of Michaels's confession. The jury had already found a financial motive as a special circumstance during the guilt phase. But during the penalty phase the jury had the opportunity to consider the specific facts underlying that special circumstance again, and, critically, to weigh those facts

16

against the key mitigating evidence presented by the defense—that there was another motive as well, protecting Christina from her abusive mother.

First, the majority mischaracterizes Dr. Hubbard's testimony, stating that his testimony "show[ed] it was the money, and not protecting Christina, that was his true motivation." Majority Op. at 9. But Dr. Hubbard did not endorse this theory, as shown by this exchange on cross-examination:

> Q: … Did you consider the statement by Christina Clemons that 'I suggested to Kurt Michaels that my mother might have life insurance as to give him motivation to kill her. She had told me once that since I was in a treatment, that I was her beneficiary again and who to contact at Pepper Tree Nursery to help me.' Did you consider that statement?
> A: I did.
> Q: So money was part of the dynamics in the relationship of Christina Clemons and Mr. Michaels regarding the murder, was it not?
> A: *I don't see that as part of the dynamics*, I see that as another tool of manipulation that Christina Clemons was using to get Mr. Michaels to do the murder.

What followed was a lengthy exchange in which Dr. Hubbard emphasized, "[i]n my opinion the *intensity of the psychological issues involved far outweighs that of a monetary factor* in this case." Dr. Hubbard also stated that while insurance "may be a contributing factor," his assessment of Michaels's "becoming motivated to do the murder relates primarily to [Michaels's] need to protect and shelter Christina."

Dr. Hubbard's testimony thus provided context for the financial motive the jury had earlier found, reaffirming the defense's mitigation theory without disputing that there was some financial motive. Michaels's financial motive,

17

according to Dr. Hubbard, was at most a "contributing factor," subordinate to Michaels's desire to help and protect Christina. This piece of evidence, considered as a whole, was *not* cumulative of Michaels's damaging confession. It was mitigating.

The Majority Opinion also points to the fact that the jury heard that "Michaels wrote a letter before the murder that said he would do 'whatever his morals allowed' to provide financial backing for himself and Christina." Majority Op. at 9. The Opinion, however, points only to the prosecutor's *question* on this topic. Dr. Hubbard *responded* that he had "not read any letter like that."

> Q: Do you know that Mr. Michaels had stated in a letter to a gentleman by the name of 'Mr. F' that he would do whatever his morals allowed him to provide a financial backing for himself and Christina Clemons?
> A: *I did not read any letter like that.*

A prosecutor's question is not, of course, evidence, so it cannot be considered cumulative of Michaels's confession during the penalty phase.

The Majority Opinion finally cites the fact that another witness testified during the guilt phase "that Michaels made a statement about knocking off Christina's old lady, and that Christina replied, 'then we can get the money.'" Majority Op. at 10 (quoting *Michaels I*, 28 Cal. 4th at 519). This testimony, which does go to the financial gain issue, is the only piece of percipient witness evidence overlapping with Michaels's confession on the financial motive. But the force of that testimony was dubious; standing alone, it may well have been rejected by the

18

jury. The witness admitted the statements she relayed were from "overhear[ing]" the "tail end of the conversation" between Michaels and Christina, and she said she "didn't believe the conversation."

By contrast, the portion of Michaels's confession about financial motivation was detailed. His confession included the exact dollar number—$100,000—he told Popik he would give him to induce him to participate in the crime: "I told him [the insurance policy]'d help give Chris[tina] and I get a start." Michaels admitted money was a "sideline benefit" of the crime. And when the detective offered, "Because if [JoAnn Clemons] had insurance, that would provide Christina with some money to . . . ," Michaels volunteered, "To do good." On the financial gain issue, Michaels's confession was more detailed than any other evidence properly admitted during the penalty phase.

## 2. The Popik Note

The Majority Opinion spends very little time on the impact of the Popik note on the jury, but suggests the note should also be considered cumulative and so lacking in impact. Majority Op. at 11-12. I must disagree.

The note was the prosecution's *only* evidence on rebuttal, and the last evidence presented during the penalty phase. "The presentation of improper material at the end of trial magnifies its prejudicial effect because it is freshest in the mind of the jury when it retires to deliberate." *Zapata*, 788 F.3d at 1122–23

(internal brackets, quotation, and citation omitted). The Popik note, moreover, was admitted only to counter the mitigation evidence that Michaels was not normally a violent person, which was important evidence during the penalty phase.

With regard to the note, the Majority Opinion asserts that the jury "heard extensive evidence of Michaels's potential for future dangerousness, including evidence that he had a 'hit list' of future murders he wanted to commit." Majority Op. at 12. But the prosecution explicitly did not introduce the so-called "hit list" to establish Michaels's "potential for future dangerousness," nor was it permitted to do so. The district court explained that if the prosecution had sought to introduce the list as evidence that "[Michaels] [wa]s going to actually kill people" that purpose "would cause [the court] to exclude it." The list was admitted only to show Michaels's "motive to establish *a reputation* as a contract killer," not that he intended to kill anyone. *People v. Michaels*, 28 Cal. 4th 486, 534 (2002) (emphasis added). The list is therefore *not* cumulative of the Popik note as evidence of Michaels's actual propensity for violence.

In sum, the primary reasons why the improperly admitted evidence cannot be considered cumulative of other properly admitted evidence are first, "[a] confession is like no other evidence," *Fulminante*, 499 U.S. at 296, and second, the Popik note, used to highlight the argument that Michaels was extremely dangerous, was the only subject of the prosecution's rebuttal evidence, the last testimony the

20

jury heard. *See Zapata*, 788 F.3d at 1122–23. Further, neither the confession nor the note was simply redundant of other testimony; the confession was considerably more detailed, and the note went to current, actual propensity for violence, not past violence or reputational puffery.

## D. Conclusion

Given the substantial evidence in mitigation and the fact that the jury deliberated on the penalty for more than three days, it is my firm view that there is a real probability a single juror might have spared Michaels's life were it not that: the prosecutor played Michaels's entire unconstitutionally obtained confession about the circumstances of the crime at the start of the penalty phase; the prosecution described the confession in closing as "one of the most horrible and aggravated parts of the case"; the prosecution devoted its rebuttal evidence, the last evidence heard by the jury, to the Popik note; the prosecution described, in closing, Michaels's former attorney who testified about the note, as "probably my favorite witness"; and the prosecution used both the confession and the note consistently to undermine the evidence Michaels presented in mitigation.

The prosecution introduced evidence of prior violent acts, but Michaels had never been convicted of a felony. Defense counsel argued in closing, "Michaels is not the worst of the worst" and did not deserve the "ultimate penalty." In my view, at least one juror may well have so concluded but for the improperly introduced

evidence used at the trial. We have found prejudice resulting from constitutional errors in cases with far worse aggravating factors.[3] As, I am convinced, the prejudicial impact at the penalty phase of the improperly Mirandized confession statements and the Popik note, combined, more than meets the *Brecht* standard, I would reverse the death penalty verdict.

---

[3] *See, e.g.*, *Wharton v. Chappell*, 765 F.3d 953, 959, 960–61, 978–79 (defendant bludgeoned his girlfriend with a hammer, stuffed her in a barrel in his kitchen for days, and had several prior felony convictions, including the murder of a professor and the forcible rape of a sixty-one-year-old woman at knifepoint); *Hovey v. Ayers*, 458 F.3d 892, 898, 930 (9th Cir. 2006) (defendant kidnapped and killed an eight-year old girl and also had kidnapped another young girl on a separate occasion); *Douglas v. Woodford*, 316 F.3d 1079, 1083–84, 1091 (defendant sexually abused and then murdered two teenage girls and had a prior history of sexually abusing young girls). *Douglas*, *Wharton*, and *Hovey* all found that the defendant established prejudice resulting from constitutionally ineffective assistance of counsel under the standard announced in *Strickland v. Washington*, 466 U.S. 668 (1984). The Supreme Court has suggested that the *Strickland* prejudice standard imposes a higher burden on the defendant than the *Brecht* harmlessness standard. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *United States v. Dominguez Benitez*, 542 U.S. 74, 86 (2004) (Scalia, J., concurring in the judgment).